**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:    (818) 532-6499
E-mail: jpafiti@pomlaw.com

*Attorneys for Plaintiff*

(*additional counsel on signature page*)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLE LEE GREENBERG, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| SUNRUN INC., LYNN JURICH, BOB KOMIN, EDWARD FENSTER, JAMESON McJUNKIN, GERALD RISK, STEVE VASSALLO, RICHARD WONG, BEAU PEELLE, EREN OMER ATESMEN, REGINALD NORRIS, WILLIAM ELMORE, FOUNDATION CAPITAL VI, L.P., FOUNDATION CAPITAL MANAGEMENT CO. VI, LLC, CREDIT SUISSE SECURITIES (USA) LLC, GOLDMAN, SACHS & CO., MORGAN STANLEY & CO. LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, RBC CAPITAL MARKETS, LLC, KEYBANC CAPITAL MARKETS INC., and SUNTRUST ROBINSON HUMPHREY, INC., | DEMAND FOR JURY TRIAL |
| Defendants | |

## INTRODUCTION

1.      Plaintiff Carole Lee Greenberg ("Plaintiff") individually and on behalf of all the other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Sunrun Inc. ("Sunrun" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery

## NATURE OF THE ACTION

2.      This is a securities class action on behalf of all those who purchased Sunrun common stock pursuant or traceable to Sunrun's August 5, 2015 initial public stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act").

## JURISDICTION AND VENUE

3.      The claims asserted herein arise under §§11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C. § § 77k, 77l(a )(2) and 77(o)).

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

5.      Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(a)) and 28 U.S.C. § 1391(b) as the alleged Defendant Sunrun maintains its principal executive offices in this Judicial District and certain of the acts alleged in this Complaint occurred in this Judicial District.

6.      In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not

limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

7.      Plaintiff purchased Sunrun common stock at $14.00 per share on August 5, 2015 pursuant to the IPO after reviewing the Prospectus and Registration Statement (as defined below), and was damaged thereby.

8.      Defendant Sunrun is a provider of residential solar electricity and purports to operate the "second largest fleet of residential solar energy systems" in the United States.

9.      Defendant Lynn Jurich ("Jurich") is, and was at the time of the IPO, a member of Sunrun's Board of Directors and its Chief Executive Officer.

10.      Defendant Bob Komin ("Komin") is, and was at the time of the IPO, Sunrun's Chief Financial Officer.

11.      Defendants Edward Fenster ("Fenster"), Jameson McJunkin ("McJunkin"), Gerald Risk ("Risk"); Steve Vassallo ("Vassallo") and Richard Wong ("Wong") are, and were at the time of the IPO, members of the Sunrun Board of Directors, with defendant Fenster serving as its Chairman.

12.      The defendants referenced above in ¶¶ 9-11 signed the false and misleading Registration Statement used to conduct the IPO and are referred to herein as the "Individual Defendants." The defendants referenced above in ¶¶ 9 and 10 are executives of Sunrun who participated in the roadshow to sell the IPO and are sometimes referred to herein as the "Executive Defendants." Defendant Sunrun and the Individual Defendants are strictly liable for the false and misleading statements in the Registration Statement.

13.      Defendants Beau Peelle, Eren Orner Atesmen and Reginald Norris were employees of Sunrun at the time of the IPO and each sold stock in the IPO (the "Selling Stockholders"). The

securities sold by the Selling Stockholders in the IPO were acquired in connection with Sunrun's acquisition of Clean Energy Experts, LLC ("CEE") on April 1, 2015.

14.     Defendants William Elmore ("Elmore"), Foundation Capital VI, L.P. and Foundation Capital Management Co. VI, LLC (the "Venture Capital Defendants"), along with defendant Vassallo, are part of a venture capital stake in Sunrun and beneficially owned, through partnerships they controlled (Foundation Capital VI, L.P., Foundation Capital VI Principals and Foundation Capital Management Co. VI, LLC) approximately 20% of the Company's shares at the time of the IPO. Those shares controlled by the Venture Capital Defendants and Vassallo, Series A through Series E convertible Preferred Stock, automatically converted into publicly tradable common stock immediately prior to the completion of the IPO, on a one-to-one basis. These shares represented approximately 20% of the voting power on Sunrun's Board just prior to the IPO. As of the IPO, Elmore and Vassallo were managing members of Foundation Capital Management Co. VI, LLC, the general partner to Foundation Capital VI, L.P. and Foundation Capital VI Principals, and as such, had voting and dispositive power over the shares held by those entities. As a result of those holdings and by having a director on Sunrun's Board, the Venture Capital Defendants effectively controlled Sunrun and caused it to conduct the IPO. Indeed, the Registration Statement refers to the Venture Capital Defendants in stating, "[u]pon completion of this offering, our . . . directors and principal stockholders will .continue to have substantial control over us."

15.     Defendants Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., Morgan Stanley & Co. LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, RBC Capital Markets, LLC, KeyBanc Capital Markets Inc. and SunTrust Robinson Humphrey, Inc. are investment banking firms that acted as underwriters of the IPO, helping to draft and disseminate the IPO documents. These defendants are referred to herein as the "Underwriter Defendants." Pursuant to the 1933 Act, the

Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses which specialize, *inter alia,* in underwriting public IPOs of securities. They served as the underwriters of the IPO and shared more than $16.2 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Sunrun stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and the Executive Defendants, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Sunrun that Sunrun would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Sunrun had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Sunrun and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Sunrun, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Sunrun's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Sunrun's management, top executives and outside counsel and engaged in "drafting sessions" between at least March 2015 and August 2015. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Sunrun stock would be sold; (iii) the language to

be used in the Registration Statement; (iv) what disclosures about Sunrun to include in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Sunrun's management and top executives, the Underwriter Defendants knew, or should have known, of Sunrun's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class (as defined below).

**SUBSTANTIVE ALLEGATIONS**

16.     Sunrun is a provider of residential solar electricity and is said to operate the "second largest fleet of residential solar energy systems" in the United States, now with approximately 111,000 solar customers in 15 states and the District of Columbia.

17.     Founded in 2007 with a focus on home solar power installation, financing and leasing, Sunrun pioneered the use of solar as a service for residential customers. In some states Sunrun offers customers either a lease or a Power Purchase Agreement ("PPA"), whereby homeowners pay for electricity that their solar panels produce but do not have to buy solar panels outright. Sunrun installs solar energy systems on customers' homes and sells them the solar power produced by those systems for a 20-year initial term. While homeowners have the option of purchasing the solar energy system outright, most of Sunrun's customers choose to buy solar as a service to avoid the significant upfront investment of purchasing a solar energy system.

18.     In April 2015, Sunrun acquired the "consumer demand generation" company CEE, which was then being billed as the "largest lead generation company in the solar industry."

19.     Sunrun's PPA business entails net metering, which is a billing mechanism that credits solar energy system owners for the electricity they add to the grid. For example, if a residential

6

customer has a solar system, it may generate more electricity than the home uses during daylight hours. Through net metering, customers only pay for electricity to the extent that they use more than the panels on their roof feed back into the system. Because Sunrun owns most of the solar panels used by its customers, Sunrun has been able to fund most of its manufacturing, installation and servicing costs through excess solar production from the panels mounted on the roofs of its customers. Net metering also allows Sunrun to charge well above wholesale rates for the electricity it sells to homeowners.

20.     As home solar installation increased, encouraged by state and federal subsidies designed to make clean energy investment more attractive, utility companies began to complain that the new solar systems put new pressures on their old infrastructures, including circuits and power lines, requiring that they continued maintaining the electric grid while charging solar customers little or nothing for the fixed costs of maintaining the grid. There is a fixed cost to extend the grid to each electricity customer, regardless of how much or little power that customer consumes. To address these concerns, nearly half the states that permit net metering have reconsidered their net metering policies over the past year.

21.     Though Sunrun operated in 15 states at the time of its IPO, California, Nevada and Hawaii had traditionally accounted for the lion's share of the Company's revenues and profits. Nevada alone, the seventh largest U.S. state and home to one of the hottest, sunniest deserts on Earth, and thus a market with an inordinate need for air conditioning, was the third-leading solar state in 2014 according to the Solar Energy Industries Association.

22.     On or about March 27, 2015, Sunrun filed with the SEC its registration statement on Form S-l (Registration No. 333- 205217), which was amended and later declared effective by the SEC (the "Registration Statement"). Meanwhile, lawmakers in the Nevada Legislature rejected a call by rooftop solar companies, including Sunrun, to increase the cap on the number of consumers who can participate in net metering solar programs from 3% to a higher level.

7

23.     On July 31, 2015, NV Energy, a public utility which generates, transmits and distributes electric service in northern and southern Nevada, filed with the Nevada Public Utilities Commission ("PUC") seeking to curtail what it characterized as rooftop solar customers receiving subsidies from non-solar customers. Two of Nevada Governor Brian Sandoval's closest advisers, Pete Ernaut and Greg Ferraro, were NV Energy's top lobbyists. Governor Sandoval himself was once an attorney for a utility shareholders group. If NV Energy effected the changes it sought to the way the utility paid and billed its solar customers, it threatened to destroy Sunrun's PPA business in Nevada. Specifically, NV Energy would not only be allowed to boost its fees for solar customers, it would also be permitted to pay them below the market rate for the electricity that their solar panels put back onto the grid, and which the utility resells. Concerned about these potential regulatory threats in the lead up to its IPO, Sunrun had served a public records request on the Nevada PUC in June 2015 demanding to see all communications between NV Energy employees and lobbyists and Governor Sandoval and his staff, including current PUC Chairman Paul Thomsen.

24.     Immediately after NV Energy's filing with the Nevada PUC, Sunrun hastened to commence its IPO. On or about August 5, 2015, Sunrun, the Selling Stockholders, the Venture Capital Defendants and the Underwriter Defendants priced the IPO at $14.00 per share, filed with the SEC the final prospectus for the IPO (the "Prospectus"), which forms part of the Registration Statement (the Prospectus and Registration Statement are collectively referred to herein as the "Registration Statement"), and sold 17.9 million shares of Sunrun common stock to the investing public.

25.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

26.     Concerning the Company's "core solar product offerings," the Registration Statement claimed to "provide homeowners with simple, *predictable pricing* for solar energy *that is insulated from rising retail electricity prices.*"[1] Concerning the Company's "strategy," the Registration Statement also emphasized that Sunrun "continue [d] to sell *customer-friendly solar service offerings with customized configurations and pricing.*" These statements were false and misleading and omitted material information. In fact, the Company was charging well above wholesale rates to its solar customers and Sunrun's business was suffering from negative perceptions created as consumers learned this.

27.     Regarding the installation of solar units on Sunrun's customers' homes pursuant to 20-year contracts, the Registration Statement claimed that "[i]n exchange, [Sunrun] receive[s] *20 years of predictable cash flows* from high credit quality customers." These statements were false and misleading and omitted material information. Nevada legislators were then seeking to modify or eliminate net metering policies that were purportedly unfairly shifting the costs of solar manufacturing, installation and maintenance to non-solar users. Due to the intense regulatory scrutiny the Company's net metering policies were then being subjected to in Nevada in particular, not only were Sunrun's Nevada customers at risk of loss, the Company would face difficulty throughout the country getting customers to agree to sign on to 20-year contracts with state regulators willing to *retroactively* increase fixed solar connection fees and reduce solar net metering credits.

28.     Concerning the Company's purported then-ongoing sales growth, the Registration Statement stated that Sunrun had *"experienced substantial growth in [its] business and operations since [its] inception in 2007"* and that *"recent trends"* in the home solar industry made "solar energy a cost-effective power source for homeowners in an increasing number of markets." The Registration

---

[1] All emphasis in bold and italics is added, unless otherwise noted.

Statement bolstered the assertion that Sunrun was benefiting from "recent trends" by stating that those trends included "[r]ising utility energy prices" and' "[d]eclining solar energy system costs." The Registration Statement also identified "[n]et metering" as one of the "federal, state, and local policies [that had] also been [a] strong factor[] affecting the market for distributed solar generation," stating that "[a] substantial majority of states ha[d] net metering policies whereby homeowners [could] offset electricity purchased from a utility by the amount of excess solar energy produced and sold to the utility." It also emphasized that "[n]et metering help[ed] reduce peak electricity load and offset[] the construction of new generation transmission and distribution facilities and the increased output from traditional generation facilities." These statements were false and misleading and omitted material information because net metering was then being eliminated by the Nevada PUC and was otherwise being regulated to the detriment of Sunrun.

29. Detailing the "key elements of [Sunrun's] platform," the Registration Statement emphasized that Sunrun "focus[ed] [its] resources on ***markets with . . . favorable policy environments,*** " stating that the Company "believe[d] that [its] distinctive approach [would] create a higher quality portfolio of solar energy assets that create significant value for [its] customers ***while generating reliable cash flow to [the Company] over time.*** " The Registration Statement further listed as Sunrun's "strategy," "[e]xpand[ing] [its] Geographic Footprint." These statements were false and misleading .and omitted material information. Sunrun had committed immense resources to Nevada, where net metering was then being attacked in the Nevada PUC. Indeed, far from being a favorable policy environment, the Company then faced considerable opposition in Nevada, including from Nevada Governor Sandoval's ties to NV Energy, which had prompted the Company to issue a public records inspection demand in June 2015 demanding NV Energy's communications with the Nevada PUC. A large portion of Sunrun's purported "Geographic Footprint" was in fact vanishing. Indeed, when the Company later disclosed the magnitude of its exposure and committed resources to Nevada

10

when it exited the Nevada market, securities analysts were surprised and Sunrun's stock price plummeted.

30.    Concerning the Company's key strengths, the Registration Statement highlighted Sunrun's "[p]roven [e]xecution," emphasizing that "[a]s of March 31, 2015, [Sunrun] had deployed 430 MW of residential systems, *creat[ing] $1.1 billion of estimated retained value"* and stating elsewhere that Sunrun "consider[ed] a discount rate of 6% *to be appropriate* based on recent market transactions *that* demonstrate that *a portfolio of residential solar homeowner contracts is all asset class that can be scrutinized successfully on a long term basis,* with a coupon of less than 5%." These statements were false and misleading because the Company was using a 6% discount rate in ascertaining that "retained value," which overstated the retained value because a 6% discount rate was only appropriate for highly liquid assets—something 20-year residential solar contracts subject to huge regulatory risks *simply were not*.

31.    Concerning the Company's "strategy," the Registration Statement stated that Sunrun then planned to "Grow [its] Direct-to-Consumer Presence," emphasizing that it would *"continue to invest in and expand [its] direct-to-consumer channel* and that by *"managing the entire process* from sales to installation to ongoing monitoring, [Sunrun was] *well positioned to create value by pursuing attractive markets."* These statements were false and misleading and omitted material information because, in fact, Sunrun was *not* pursuing "attractive markets" and was bogged down with a massive investment in Nevada and faced a hostile market and the influence of a purportedly conflicted state governor the Company was then actively investigating.

32.    Concerning Sunrun's customer concentration, the Registration Statement affirmatively stated that Sunrun had customers in 15 states and the District of Columbia. Specifically, the Registration Statement stated that Sunrun "currently provide[d] solar energy services in Arizona, California, Delaware, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, Nevada, New

11

Hampshire, New Jersey, New York, Oregon, Pennsylvania and South Carolina, as well as the District of Columbia." The Registration Statement stated elsewhere that Sunrun's "business [was] concentrated in certain markets, putting [it] at -risk of region specific disruptions," purportedly due to potential earthquakes, and misleadingly emphasized that "[a]s of March 31, 2015, approximately 58% of [Sunrun'·s] customers were in California and [that the Company then] expect[ed] much of [its] near-term future growth to occur in California." These statements were false and misleading and omitted material information because the Company was then being attacked by the Nevada PUC and was therefore losing 20% of its business. The actual region "risk" that Sunrun faced was not about earthquakes in California—it was about Nevada.

33.     The statements referenced above in ¶¶ 26-32 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO:

(a)     Sunrun's actual historical operating costs were being understated by not identifying and disclosing the fixed grid costs being borne for it by public utilities where net metering programs were being employed;

(b)     Sunrun had been charging well above wholesale rates for the electricity it was selling to its net metering customers;

(c)     Contrary to having listed customers dispersed across 15 states and the District of Columbia in its Registration Statement, Sunrun had a substantial 20% customer concentration in Nevada alone;

(d)     Sunrun's ability to continue to convince customers to sign 20-year contracts—which lowers the fixed costs for installing solar systems on those customers' houses—was in jeopardy due to the ongoing regulatory review of net metering programs in 20 of the 40 states that then permitted net metering;

12

(e)     Because Sunrun was employing an unreasonably low discount rate of 6% in calculating the value of it retained assets, it was overstating their value; and

(f)     As a result of the foregoing, at the time of the IPO, the Company's business and financial prospects were not what defendants had led the market to believe they were in the Registration Statement.

34.     Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. At the time of the IPO, unbeknownst to investors, Sunrun's historical costs were being understated, the Company was charging customers well above wholesale rates for the electricity it was selling, its customers were highly concentrated in the State of Nevada, and its ability to continue signing customers to 20-year contracts was in jeopardy due to intense regulatory scrutiny prompted by utility company concerns. The adverse events and uncertainties associated with these negative trends were reasonably likely to have a material impact on Sunrun's profitability, and, therefore, were required to be disclosed in the Registration Statement, but were not.

35.     While the Registration Statement purported to contain certain "warnings" that could make the investment in Sunrun stock risky, those risk disclosures were themselves false and misleading. For instance, the Registration Statement stated that "[i]n addition to changes in general rates charged to all residential customers, utilities are increasingly seeking solar-specific charges (which may be fixed charges, capacity-based charges, or other rate changes)" and that "[a]ny of these changes could materially reduce the demand for our products and could limit the number of markets in which our products are competitive with electricity provided by the utilities." These statements were false and misleading and omitted material information because NV Energy had just moved the Nevada PUC to increase Nevada's fixed solar connection fee and to reduce its net metering credits, while the Nevada

PUC was under a directive by the Nevada Legislature to address purported inequities in net metering. In fact, this motion and NV Energy's ties to Governor Sandoval were so significant that the Company filed a public records inspection demand on the Nevada PUC regarding its rule-making decision on NV Energy's request. Likewise, the following purported risk disclosure was not only false and misleading for failing to disclose· the intense regulatory scrutiny being experienced in Nevada and Governor Sandoval's ties to the public utility company seeking reform, *it was false and misleading in that it expressly misstated the Nevada Legislature's directive to the Nevada PUC and implied that the Nevada Legislature had supported not only continuing net metering in Nevada but eliminating the 3% cap on it as Sunrun and other solar companies had requested*:

> Utilities, their trade associations, and fossil fuel interests in the country are currently challenging net metering policies, and seeking to either eliminate it, cap it, or impose charges on homeowners that have adopted net metering. Some states, including California, currently set limits on the total percentage of a utility's customers that can adopt net metering. Maryland, Nevada and New York also have metering caps and other states we serve now or in the future may adopt metering caps. If the net metering caps in California or other jurisdictions are reached without an expansion of net metering policies, homeowners in the future will be unable to recognize the cost savings associated with net metering they currently enjoy. Of the states in which we offer our solar service offerings, only *Nevada is expected to reach its cap within the next 12 months unless the cap is increased. We currently expect Nevada to reach its cap in the next month unless it is increased. However, legislation has been adopted that requires that all uncapped program approved by the Nevada Public Utilities Commission be implemented in Nevada no later than December 31, 2015*. If changes to net metering policies occur without grandfathering to existing homeowners, those existing homeowners could be negatively impacted which could create a default risk from those homeowners. *Our ability to sell our solar service offerings may be adversely impacted by the failure to expand existing limits to net metering*.

36.    The IPO was successful for the Company, the Selling Stockholders and the Underwriter Defendants who sold 17.9 million shares of Sunrun common stock to the investing public, raising $250.6 million in gross proceeds ($234.3+ million net of underwriting fees and IPO costs). Of this, the

Company sold 17,482,268 shares, receiving $228,842,888 in gross proceeds and the Selling Stockholders collectively sold another 417,7732 shares, receiving $5,468,1.12 in gross proceeds.

37.     However, the price of Sunrun common stock plummeted as the market learned, following the IPO, that the Company's business metrics and financial prospects were not as strong as represented in the Registration Statement. Just months after the IPO and in Sunrun's maiden first quarter as a public company, on January 7, 2016, the Company admitted that it was ceasing all operations in Nevada. When Sunrun reported its fiscal 2015 results and fiscal 2016 guidance on March 10, 2016, the Company also admitted that residential solar growth would decline in 2016 due to its having halted operations in Nevada. According to the Company, 2016 installation growth will fall from 76% in 2015 to just 40% in 2016. Adding insult to injury, investors learned for the first time the full extent of customer concentration the Company had in Nevada. Securities analysts accused the Company of surprising them in the Company's earnings call, asserting they were not informed of the extent of the Company's exposure to Nevada and had been under the impression since the IPO that Sunrun was expecting share gains in the industry and growth, ***not*** deceleration. Thereafter, multiple analyst reports commented on the surprise and the lack of information they were provided. For instance, defendant KeyBanc's March 21, 2016 report emphasized that "[o]n Nevada, we view the expected headwind as unsurprising but acknowledge at ~20% of [Sunrun's] direct deployments, ***this market had become a bigger piece of [Sunrun's] business than, we anticipated.***" Likewise, lowering its price target "on Sunrun stock by one-third, defendant Morgan Stanley lamented in its report that "***the company's exposure to the state was larger than many, including ourselves, had anticipated***." Lowering its own price target by 40%, defendant Credit Suisse also highlighted Sunrun's "***higher than expected mix of Nevada deployments***" and stated that it too "***had underappreciated how quickly Nevada had growth when [it had] attempted to asses risks to volumes***." Furthermore, certain stock analysts have applied a higher discount rate in "calculating the value of Sunrun's retained assets,

including Deutsche Bank, which applies an 8% (rather than 6%) discount rate.[2] The price of Sunrun common stock has since plummeted and now trades below $7 per share, *or at less than 50%* of the price the stock was sold at in the IPO.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action on behalf of all those who purchased Sunrun common stock pursuant or traceable to the Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are defendants and their families, the officers, directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sunrun or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complaint of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

---

[2] While defendant Morgan Stanley's January 28, 2016 client report still implies a retained value of $1.1 billion on Sunrun's assets, it applies a 7% discount rate, which apparently computes no growth in the retained assets since June 30, 2015.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether defendants violated the 1933 Act;

(b)  whether statements made by defendants to the investing public in the Registration Statement and Prospectus misrepresented material facts about the business and operations of Sunrun; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

**For Violation of §11 of the 1933 Act Against**
**Sunrun, the Individual Defendants and the Underwriter Defendants**

44.     Plaintiff incorporates ¶¶ 1-43 by reference.

45.     This Cause of Action is brought pursuant to § 11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against Sunrun, the Individual Defendants and the Underwriter Defendants.

46.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

47.     The defendants named in this Cause of Action are strictly liable to Plaintiff and the Class for the misstatements and omissions.

48.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

49.     By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

50.     Plaintiff acquired Sunrun common stock in the IPO.

51.     Plaintiff and the Class have sustained damages. The value of Sunrun common stock has declined substantially subsequent to and due to these defendants' violations.

52.     At the time of their purchases of Sunrun common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff commenced this action. Less than three years have elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of §12(a)(2) of the 1933 Act Against
### Sunrun, the Executive Defendants, the Selling Stockholders
### and the Underwriter Defendants

53.     Plaintiff incorporates ¶¶ 1-52 by reference.

54.     By means of the defective Prospectus, defendants Sunrun, the Executive Defendants, the Selling Stockholders and the Underwriter Defendants promoted and sold Sunrun stock to Plaintiff and other members of the Class.

18

55.     The Prospectus contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above. The defendants named in this Cause of Action owed Plaintiff and the other members of the Class who purchased Sunrun common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

56.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Sunrun common stock.

57.     By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Plaintiff and the other members of the class who purchased Sunrun common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of Sunrun stock. Accordingly, Plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued herein. Class members who have sold their common stock seek damages, to the extent permitted by law.

## THIRD CAUSE OF ACTION

### For Violation of §15 of the 1933 Act Against
### Sunrun, the Selling Stockholders, the Venture Capital Defendants
### and the Individual Defendants

58.     Plaintiff incorporates ¶¶ 1-57 by reference.

59.   This Cause of Action is brought pursuant to §15 of the 1933 Act against Sunrun, the Selling Stockholders, the Venture Capital Defendants and the Individual Defendants.

60.   The Individual Defendants each were control persons of Sunrun by virtue of their positions as directors and/or senior officers of Sunrun. Each of the Venture Capital Defendants controlled Sunrun by their voting and dispositive control over approximately 20% of Sunrun's outstanding voting shares, pre-IPO shareholder agreements, and by having a designee on Sunrun's Board at the time of the IPO, Vassallo. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Sunrun. The Selling Stockholders and the Venture Capital Defendants were control persons of Sunrun by virtue of their ownership of Sunrun stock and their rights to force Sunrun to register that stock for resale. Sunrun controlled the Individual Defendants and all of its employees.

61.   The Venture Capital Defendants had a financial interest in taking the Company's stock public in order to increase the holding value and marketability to the Venture Capital Defendants' investment in Sunrun. Sunrun, the Venture Capital Defendants and the Individual Defendants were each critical to effecting the IPO, based on their signing or authorization of the signing of the Registration Statement, by voting (including voting their shares) to execute the IPO, and by having otherwise directed through their authority the processes leading to execution of the IPO.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven .at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 6, 2016

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

21

**SUNRUN INC (RUN)**                                              **Greenberg, Carole Lee**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 8/5/2015 | Purchase | 200 | $14.0000 |