**POMERANTZ LLP**
Patrick V. Dahlstrom (admitted *pro hac vice*)
Joshua B. Silverman (admitted *pro hac vice*)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois  60603
Tel.:   312.377.1181
pdahlstrom@pomlaw.com
jbsilverman@pomlaw.com
*Lead Counsel for Plaintiff*
(*additional counsel on signature page*)

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLE LEE GREENBERG, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>        vs.<br><br>SUNRUN INC., LYNN JURICH, BOB KOMIN, EDWARD FENSTER, JAMESON McJUNKIN, GERALD RISK, STEVE VASSALLO, RICHARD WONG, CREDIT SUISSE SECURITIES (USA) LLC, GOLDMAN, SACHS & CO., MORGAN STANLEY & CO. LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, RBC CAPITAL MARKETS, LLC, KEYBANC CAPITAL MARKETS INC., and SUNTRUST ROBINSON HUMPHREY, INC.,<br><br>                                    Defendants | Case No. 3:16-cv-02480-CRB<br><br>CLASS ACTION<br><br>Hon. Charles R. Breyer<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

1    Lead Plaintiff Sunrun Investor Group, consisting of the Gregory and Lillian Lennox

2 Family Trust, Ali B. Zanjani, Teresa Nicastro, and Murray Hoffman ("Plaintiff"), individually

3 and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys,

4 alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts,

5 and upon information and belief as to all other matters based on the investigation conducted

6 by and through Plaintiff's attorneys, which included, among other things, a private

7 investigation, a review of defendants' public documents, conference call transcripts,

8 Securities and Exchange Commission ("SEC") filings by Sunrun Inc. ("Sunrun" or the

9 "Company"), as well as media and analyst reports about the Company, records from the State

10 of Nevada and other states in which Sunrun operated, and other obtainable information.

11 Plaintiff believes that substantial evidentiary support will exist for the allegations set forth

12 herein after a reasonable opportunity for discovery.

13                              **NATURE OF THE ACTION**

14    1.    This is a securities class action on behalf of all those who purchased Sunrun

15 common stock pursuant or traceable to Sunrun's August 5, 2015 initial public stock offering

16 (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities

17 Act").

18    2.    Sunrun is a residential solar leasing company that builds, owns and maintains

19 solar systems on the rooftops of homeowners.  Sunrun focuses on a particular kind of lease

20 called a power purchase agreement ("PPA"), a 20-year contract under which the homeowner

21 pays a charge for each kilowatt-hour of energy delivered by the solar system installed by

22 Sunrun, in lieu of a fixed monthly lease charge.  To a much lesser extent, Sunrun also markets

23 solar systems through conventional cash leases, and occasionally, for outright purchase.

24 Sunrun's residential solar systems supplement, but do not replace, utility-generated electricity.

25 Because Sunrun systems only supply power during certain times of the day and in certain

26 weather conditions, Sunrun customers must also remain connected to the grid and remain

27 customers of their local electric utilities, where they remain subject to rates, tariffs and fees

28 imposed by electric utilities and approved by state regulators.

3.      Sunrun's business depends heavily on government handouts and incentives which vary from state to state.  Therefore, at the time of its IPO, Sunrun only operated in fifteen states it described to be "favorable policy environments." The most important state-based subsidy is called "net metering" or "net electric metering."  Net metering rules require local electric utilities to buy back excess electricity from homeowners with solar rooftop systems at subsidized rates.  In a common implementation, electric utilities are required to credit homeowners at the full retail rate, often several  times as much as the utility would pay to purchase electricity from a power plant.  Even worse, although net metering customers (like other homeowners) enjoy the full benefit of access upon demand to as much electricity as they desire from the electric grid, they do not pay their fair share of the costs necessary to maintain that demand capacity or the electric grid.  Net metering has come under heavy fire in recent years because it is regressive and inequitable, forcing electric customers without solar systems to subsidize a wealthier minority of homeowners with rooftop solar systems.

4.      In the months before Sunrun's August 5, 2015 IPO, lucrative net metering subsidies were threatened in Sunrun's most important markets:

a.  In Nevada, Sunrun's most important growth market, legislators passed a bill requiring that net metering subsidies be replaced with a tariff system that eliminated all unreasonable subsidies.   That statute required Nevada's largest electric utility, NV Energy, to propose a net metering tariff that did not unreasonably subsidize residential solar by July 31, 2015.  As required, NV Energy proposed a solar tariff that was far less advantageous than the prior net metering regime, and aimed at making rooftop solar system owners pay their fair share of electric capacity and grid maintenance costs.

b.  In California, Sunrun's largest market, net metering subsidies were also scheduled to be reconsidered.  The enabling legislation expressly contemplated consideration of proposals detrimental to solar leasing companies, including fixed fees and time-of-use metering.   As a result, solar industry analysts expected the new net metering structures to "reduce the value of energy"

1        produced by residential rooftop systems like those leased by Sunrun, in

2        comparison to the subsidies scheduled to lapse.

3       c.  Hawaii was actively considering eliminating net metering altogether.

4       d.  Arizona regulators temporarily approved a hefty fee on residential solar

5        customers undermining the impact of subsidies, and although that fee was lifted,

6        regulators indicated that fees and net metering would be reconsidered as other

7        electric rates were updated.

8     5.    Prior to its IPO, regulators also focused on improper sales practices by solar

9 leasing companies like Sunrun.  Arizona, in particular, passed solar leasing consumer

10 protection legislation that Sunrun's lobbying front, The Alliance for Solar Choice ("TASC"),

11 argued was so disadvantageous to solar leasing companies that it would run them out of the

12 state.

13     6.    On August 5, 2015, Sunrun completed its IPO, selling 17.9 million shares to

14 unsuspecting investors using a Registration Statement and Prospectus that were negligently

15 prepared.  The Registration Statement and Prospectus used to sell these shares provided

16 materially false and misleading descriptions of Sunrun's business and regulatory environment.

17 Specifically, as is more fully detailed in Paragraphs 78 to 89 below, the Registration

18 Statement and Prospectus:

19        •  falsely claimed that the Company focused on states with "favorable policy

20        environments";

21        •  omitted material adverse information regarding the elimination, reduction, and

22        reform of subsidies in Sunrun's most important markets, including a Nevada

23        requirement that unreasonable net metering subsidies be eliminated by the end

24        of 2015;

25        •  omitted material adverse information regarding the importance of the Nevada

26        market to the Company's sales and growth;

27        •  omitted material adverse information regarding regulations aimed at deceptive

28        sales practices, including Arizona regulations which Sunrun's own lobbying

1   arm conceded were detrimental to its business model; and

2   • falsely claimed that Sunrun's core PPA product "insulated" customers from

3   rising retail electricity costs policy, when in fact it did not.

4   7.    As a result of the materially false and misleading Registration Statement and

5   Prospectus, Sunrun's IPO raised over $250 million (before underwriting fees and IPO costs).

6   8.    Sunrun shares lost more than half of their value as the risks concealed by its

7   Registration Statements and Prospectus misrepresentations and omissions became known.

8   Sunrun shares continue to trade at less than half of their IPO price.

9   **JURISDICTION AND VENUE**

10   9.    The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities

11   Act (15 U.S.C. § § 77k, 771(a )(2) and 77(o)).

12   10.    This Court has jurisdiction over the subject matter of this action pursuant to 28

13   U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

14   11.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities

15   Act (15 U.S.C. § 77v(a)) and 28 U.S.C. § 1391(b) as Defendant Sunrun maintains its principal

16   executive offices in this Judicial District and certain of the acts alleged in this Complaint

17   occurred in this Judicial District.

18   12.    In connection with the acts, conduct and other wrongs alleged herein,

19   Defendants either directly or indirectly used the means and instrumentalities of interstate

20   commerce, including but not limited to the United States mails, interstate telephone

21   communications and the facilities of the national securities exchange.

22   **PARTIES**

23   13.    Plaintiff Gregory and Lillian Lennox Family Trust is a member of Lead

24   Plaintiff Sunrun Investor Group and purchased Sunrun common stock as set forth in its

25   previously-filed certification.

26   14.    Plaintiff Ali B. Zanjani is a member of Lead Plaintiff Sunrun Investor Group

27   and purchased Sunrun common stock as set forth in her previously-filed certification.

28   15.    Plaintiff Teresa Nicastro is a member of Lead Plaintiff Sunrun Investor Group

1 | and purchased Sunrun common stock as set forth in her previously-filed certification.

2 |       16.     Plaintiff Murray Hoffman is a member of Lead Plaintiff Sunrun Investor

3 | Group and purchased Sunrun common stock as set forth in his previously-filed certification.

4 |       17.     Defendant Sunrun is a Delaware corporation engaged in the leasing of

5 | residential rooftop solar systems.  Sunrun's principal place of business is in this District at

6 | 595 Market Street, 29th Floor, San Francisco, California 94105.  Sunrun went public via an

7 | August 5, 2015 IPO, and trades on the Nasdaq Global Select market under the ticker symbol

8 | "RUN."  As the issuer, Sunrun is strictly liable under Section 11 of the Securities Act for

9 | misrepresentations and omissions in the Registration Statement.

10 |       18.     Defendant Lynn Jurich ("Jurich") co-founded Sunrun, and is, and was at the

11 | time of the IPO, Sunrun's Chief Executive Officer and a member of Sunrun's Board of

12 | Directors.  Jurich signed and caused to be filed with the SEC the materially false and

13 | misleading Registration Statement.

14 |       19.     Defendant Bob Komin ("Komin") is, and was at the time of the IPO, Sunrun's

15 | Chief Financial Officer.  Komin signed and caused to be filed with the SEC the materially

16 | false and misleading Registration Statement.

17 |       20.     Defendants Edward Fenster ("Fenster") co-founded Sunrun and is, and was at

18 | the time of the IPO, a Director of Sunrun and Chairman of Sunrun's Board of Directors.

19 | Fenster signed and caused to be filed with the SEC the materially false and misleading

20 | Registration Statement.

21 |       21.     Defendant Jameson McJunkin ("McJunkin") is, and was at the time of the IPO,

22 | a Director of Sunrun.  McJunkin signed and caused to be filed with the SEC the materially

23 | false and misleading Registration Statement.

24 |       22.     Defendant Gerald Risk ("Risk") is, and was at the time of the IPO, a Director

25 | of Sunrun.  Risk signed and caused to be filed with the SEC the materially false and

26 | misleading Registration Statement.

27 |       23.     Defendant Steve Vassallo ("Vassallo") is, and was at the time of the IPO, a

28 | Director of Sunrun.  Vassallo signed and caused to be filed with the SEC the materially false

1    and misleading Registration Statement.

2        24.    Defendant Richard Wong ("Wong") is, and was at the time of the IPO, a

3    Director of Sunrun.  Wong signed and caused to be filed with the SEC the materially false and

4    misleading Registration Statement.

5        25.    The Defendants referenced above in ¶¶ 18 to 24 are referred to herein as the

6    "Individual Defendants." Defendant Sunrun and the Individual Defendants are strictly liable

7    for the false and misleading statements in the Registration Statement.

8        26.    Defendant Goldman, Sachs & Co. ("Goldman Sachs") is an investment

9    banking firm that is identified as an underwriter in the Registration Statement and Prospectus.

10   As an underwriter for Sunrun's IPO, Goldman Sachs assisted in the preparation and

11   dissemination of the Registration Statement and Prospectus.  Goldman Sachs's headquarters

12   are located in New York, New York.

13       27.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an

14   investment banking firm that is identified as an underwriter in the Registration Statement and

15   Prospectus.  As an underwriter for Sunrun's IPO, Credit Suisse assisted in the preparation and

16   dissemination of the Registration Statement and Prospectus.  Credit Suisse's headquarters are

17   located in New York, New York.

18       28.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment

19   banking firm that is identified as an underwriter in the Registration Statement and Prospectus.

20   As an underwriter for Sunrun's IPO, Morgan Stanley assisted in the preparation and

21   dissemination of the Registration Statement and Prospectus.  Morgan Stanley's headquarters

22   are located in New York, New York.

23       29.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill

24   Lynch") is an investment banking firm that is identified as an underwriter in the Registration

25   Statement and Prospectus.  As an underwriter for Sunrun's IPO, Merrill Lynch assisted in the

26   preparation and dissemination of the Registration Statement and Prospectus.  Merrill Lynch's

27   headquarters are located in New York, New York.

28       30.    Defendant RBC Capital Markets, LLC ("RBC Capital") is an investment

1  banking firm that is identified as an underwriter in the Registration Statement and Prospectus.

2  As an underwriter for Sunrun's IPO, RBC Capital assisted in the preparation and

3  dissemination of the Registration Statement and Prospectus.  RBC Capital's headquarters are

4  located in Toronto, Ontario, Canada.

5         31.      Defendant KeyBanc Capital Markets Inc. ("KeyBanc") is an investment

6  banking firm that is identified as an underwriter in the Registration Statement and Prospectus.

7  As an underwriter for Sunrun's IPO, KeyBanc assisted in the preparation and dissemination

8  of the Registration Statement and Prospectus.  KeyBanc's headquarters are located in

9  Cleveland, Ohio.

10         32.      Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") is an investment

11  banking firm that is identified as an underwriter in the Registration Statement and Prospectus.

12  As an underwriter for Sunrun's IPO, SunTrust assisted in the preparation and dissemination of

13  the Registration Statement and Prospectus.  SunTrust's headquarters are located in Atlanta,

14  Georgia.

15         33.      Defendants Goldman Sachs, Credit Suisse, Morgan Stanley, Merrill Lynch,

16  RBC Capital, KeyBanc and Suntrust are referred to herein as the "Underwriter Defendants."

17  In connection with this role, the Underwriter Defendants:

18        (a)      were well-compensated with underwriting fees and/or discounts totaling more

19  than $16.2 million;

20        (b)      arranged a multi-city roadshow prior to the IPO during which they, with the

21  assistance of Sunrun executives, sold the IPO to potential investors;

22        (c)      demanded and obtained an agreement from Sunrun that Sunrun would

23  indemnify and hold the Underwriter Defendants harmless from any liability under the federal

24  securities laws;

25        (d)      assisted in planning the IPO and drafting the Registration Statement and

26  Prospectus;

27        (e)      were provided broad access to confidential corporate information concerning

28  Sunrun's operations and financial prospects; and

(f)     requested on August 4, 2015 that the SEC declare Sunrun's Registration Statement effective so that they could sell Sunrun shares to investors.

## BACKGROUND

### Electric power generation in the United States

34.     In the United States, electric utilities and other corporate energy providers generate most of the nation's electricity at large power plants.  Utility scale power plants can be conventional (gas-fired, coal-fired, nuclear) or can utilize renewable resources (solar farms, wind farms, hydraulic dams, geothermal plants, etc.).  The electricity is then transmitted through an interconnected network of transmission lines, substations, and transformers known collectively as the "electrical grid," and delivered to end users on a metered basis.

35.     Not all power is generated by utility-scale plants.  Electricity can also be generated on a smaller scale at the point of consumption, for example, through a rooftop solar system, windmill, or microturbine.  This is known as "distributed generation." In prior decades, distributed generation consisted primarily of backup generators that were used when grid-supplied power was unavailable, or combined heat-and-power systems that provided thermal and electrical energy for commercial, educational and medical facilities.

36.     More recently, residential solar-based and wind-based distributed generation systems have become popular.  While such systems offer renewable energy, their output varies heavily depending on time of day and weather.  During dark and cloudy periods, a solar system may generate little or no power, whereas early afternoons on sunny days may generate more power than a consumer needs (especially, for residential rooftop installations, if the homeowners work outside of the home during this peak generation period).  Similarly, a wind turbine may generate more power than a consumer needs during gusty periods but will not generate sufficient power during still periods.  For these reasons, homes with residential distributed generation systems almost always remain connected to the electrical grid.

37.     Solar energy installations are heavily subsidized.  Some of these subsidies are available both to large, utility-scale solar plants and to residential rooftop installations.  For

example, all owners of solar systems are entitled to a federal 30% tax investment tax credit, which will phase out over the next decade.  However, the tax credit runs only to the owner of the solar system.  Thus, where a homeowner leases a rooftop solar installation from a third-party lessor like SunRun, the tax credit will go to the lessor not the homeowner.

38.     Solar subsidies, and in particular net metering, allow recipients to avoid paying their fair share of the benefits they receive for being attached to the electric grid, and for being able to access as much energy as they desire upon demand.   Providing this energy is enormously costly.  Unlike most industries that are able to freely price products and control production, utilities are required to supply whatever consumers desire during peak periods, and to do so at prices set by state regulators.  This requires them to maintain a vast array of expensive equipment on standby, including transformers, wires, substations, and generating stations.  Moreover, because supply needs to be scaled to meet peak demand, the per-kilowatt-hour cost to utilities to provide peak energy is far more expensive than providing a smaller load.   In Nevada, for example, the majority of variable costs are attributable to the expense of providing additional demand available to all customers, standard or solar:



*Source: slides used by NV Energy in testimony before the Nevada Assembly Committee on Commerce and Labor, May 20, 2015.*

Solar net metering subsidizes the bills of solar customers, so that they pay far less than their share of the approximately 71% of the total electric cost structure that is not avoidable and does not depend upon the amount of energy a particular customer uses.  Ultimately, these subsidies are borne by other ratepayers.

39.     Solar net metering becomes an ever greater drag on the electric system as solar penetration increases, because the heavily subsidized excess electricity is provided at a time when demand is already satisfied.  Aggregate electric demand across the grid varies widely by time of day. In regions without significant solar generation, demand ramps rapidly during the morning, moderates slightly through the working day, and ramps again to peak at around 6 p.m.:



*Source: Energy Information Agency.*[1]

―――――――――――――

[1] *See* http://www.eia.gov/todayinenergy/detail.cfm?id=830

1  However, for states with significant solar penetration, demand from the electrical grid dips

2  substantially during the workday when solar generation is at its highest, and ramps severely as

3  the sun begins to set and commuters return home from work.   This heavily skewed

4  consumption pattern, also known as a "duck curve," has dramatically affected electricity

5  demand in Western states like California (left) and Hawaii (right):



Sources: CleanTechnica (California), Institute for Local Self-Reliance (Hawaii)[2].

This profound shift of the demand curve has put substantial pressure on regulators to either

slash net metering subsidies or to tie them to rates dependent upon the time of day in which

electricity is provided.

**Sunrun builds a business around net metering subsidies**

40.     Defendants Jurich and Fenster launched Sunrun in 2007 to sell residential solar

as a service using the same financial engineering concepts already prevalent in utility-scale

sell solar energy installations.   Sunrun sells solar-generated electricity primarily using a

specialized lease called a power purchase agreement ("PPA").   Under a PPA, Sunrun installs

and maintains a solar system for little or no charge to a homeowner, in exchange for the

homeowner's agreement to buy the power generated from the solar system at a fixed cost for

a 20-year period.   Additionally, like larger solar projects, Sunrun packages and sells the tax

[2] *See* http://cleantechnica.com/2014/07/21/utilities-cry-fowl-over-duck-chart-and-distributed-solar-powercrying-fowl-or-crying-wolf-open-season-on-the-utilitys-solar-duck-chart/;
https://ilsr.org/report-renewable-hawaii/

1   credits it receives to investment banks and other financial buyers.

2       41.     Although Sunrun adopted many of the business practices of utility-scale solar

3   plants, the residential market is unique.  Residences also consume electricity, and rooftop

4   solar systems do not generate sufficient energy to meet a homeowner's electrical needs during

5   most hours of the day.  Rooftop solar systems can also be insufficient even during midday

6   hours under certain weather conditions.  Therefore, Sunrun customers must continue to

7   maintain connections to the electrical grid and remain customers of their local electric utility.

8       42.     In virtually all cases, a bidirectional meter is installed that allows Sunrun

9   customers to sell excess daytime solar electricity back to the local electric utility under the net

10   metering rules applicable in that state.  Net metering is an extremely lucrative incentive

11   adopted in many states that allows customers with rooftop solar systems or other distributed

12   generation to sell surplus electricity back to the electric utility at above-market rates, often at

13   the full retail rate.

14       43.     Net metering is vital to Sunrun's business model and the value proposition

15   Sunrun uses to market its solar systems.  Because Sunrun customers must pay two electric

16   bills, one to the electric utility and one to Sunrun, Sunrun must convince potential customers

17   that they will be able to lower their overall electric costs over the 20-year PPA by massively

18   reducing local electric utility payments through credits received from net metering subsidies.

19       44.     Sunrun's business model is so dependent upon net metering that it does not

20   even attempt to operate in states that do not have favorable net metering rules (or states that

21   limit PPAs).  At the time of its IPO, it operated only in Arizona, California, Colorado,

22   Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Nevada, New Hampshire, New

23   Jersey, New York, Oregon, Pennsylvania and South Carolina, as well as in the District of

24   Columbia.

25       45.     Net metering has become highly controversial because of its inequitable and

26   regressive nature. Net metering gives an extra windfall to rooftop solar customers by reducing

27   their contribution to covering distribution costs, while shifting those distribution costs onto

28   utility customers who don't have solar. As the Massachusetts Institute of Technology

explained:

> In an efficient and equitable distribution system, each customer would pay a share of distribution network costs that reflected his or her responsibility for causing those costs. Instead, most U.S. utilities bundle distribution network costs, electricity costs, and other costs and then charge a uniform per-kWh rate that just covers all these costs. **When this rate structure is combined with net metering, which compensates residential PV [photovoltaic solar] generators at the retail rate for the electricity they generate, the result is a subsidy to residential and other distributed solar generators that is paid by other customers on the network.**

*MIT Study on the Future of Solar Energy* (May 2015) (emphasis in original). In Nevada, for example, the net metering subsidy in place in 2014 required the utility to purchase excess energy from consumers with rooftop solar systems at 10.5 cents per kilowatt-hour ("kWh"), whereas it could purchase this electricity from other sources for only 4.5 cents per kWh.

46.     Severin Borenstein, a University of California, Berkeley economist who specializes in energy regulation and energy markets, confirms that full retail net metering is a huge subsidy. "You're basically giving them (net metering customers) retail price credit for putting power into the grid," Borenstein said. "If (the credit for power) were at wholesale rates, it wouldn't be a subsidy."[3]

47.     Although it boosts residential solar penetration, the net metering subsidy also imposes a highly regressive cost upon electric customers who can least afford to pay it. Consumers who receive the subsidy (homeowners with residential solar systems) tend to be significantly wealthier in the aggregate than consumers who pay the subsidies (renters or homeowners without residential solar systems).  For example, a 2014 California study found that the income of the median net metering household was more than one-third higher than the median net income of all households.[4]  The regressive cost-shifting has become far more significant as the number of rooftop solar installations in net metering states has exploded in recent years.

---

[3] *See* http://lasvegassun.com/news/2015/may/25/nv-energy-fights-rooftop-solar-cutting-into-profit/

[4] *See* http://www.foxnews.com/opinion/2014/09/24/sunshine-other-peoples-money-truth-about-net-metering.html

48.     In 2013, Sunrun and its largest so-called competitor, SolarCity, formed a lobbying group called The Alliance for Solar Choice ("TASC") to fight against attempts to scale back net metering and other solar subsidies.  At all times relevant hereto, Sunrun owned a major equity interest in TASC and controlled its direction.  At the time of the IPO, Sunrun's Senior Vice President ("VP") of Public Policy, Bryan Miller, served as the Chairman of TASC.

**The threat to net metering subsidies in Sunrun's most important markets**

49.      By the time of its August 2015 IPO, net metering subsidies were under heavy attack in Sunrun's most important markets.   In particular, net metering subsidies were scheduled to change in Sunrun's highest growth market, Nevada, and its largest overall market, California.  At the same time, Arizona temporarily imposed solar fees and indicated that permanent fees and other adverse policies would be under consideration during the next rate review.  It also passed strict regulations aimed at curbing deceptive solar lease sales practices.  Hawaii, another key Sunrun market, was weighing whether to end net metering all together.

### a.  Nevada passes law to scale back subsidies

50.     Sunrun's operations in Nevada exploded in 2015 and contributed heavily to Sunrun's growth metrics.  Sunrun had virtually no business in Nevada going into at least late 2014, but as Defendant Komin explained, Sunrun did so well in Nevada in 2015 that he described Nevada as a "case study" for Sunrun's growth on Sunrun's Q4 2015 earnings conference call.  According to Komin, Nevada's "volume grew from almost zero to reach about 20% of Sunrun-built deployment over only a few quarters" and also was "one of [Sunrun's] lowest cost regions." *Id.*

51.     Nevada had historically controlled the amount of net metering subsidies by capping the amount of consumers eligible for the subsidy.  In 2005, for example, net metering was limited to consumers representing 1% of peak electric system load.   This was subsequently increased to 2% then 3%.

52.     As Nevada State Senator Kelvin Atkinson explained in a May 20, 2015

legislative hearing attended both by Susan Glick, Sunrun's Senior Manager of Public Policy, and Robert Uithoven, of TASC, legislators indicated after the raise to 3% that "[t]his [was] the last time. We are not doing this again…. We are not going to continue to allow a company to continue to be subsidized, as you said, by folks who are not using the system." *See* Transcript of May 20, 2015 Hearing of Assembly on Commerce and Labor, available at https://www.leg.state.nv.us/Session/78th2015/Minutes/Assembly/CL/Final/1258.pdf.

Accordingly, Nevada legislators refused to raise the cap from 3% to 10% as solar lobbyists urged. *Id.* Senator Atkinson stressed that further increases in the solar net metering subsidy would prey upon the most vulnerable ratepayers: "For the folks who really need reduction and need help with their energy bills, they cannot afford a solar system. You have these folks subsidize the folks who can pay for a system." *Id.*

53.     At the same hearing, Nevada State Senator Marilyn Kirkpatrick confirmed that the legislature had consistently warned the solar industry that the highly lucrative net metering subsidy would only be temporary: "It has always been our attempt to back down the subsidies because at some point, why should the neighbor next door have to compensate for that to work?" *Id.* She said that the legislation under debate, Nevada SB 374, would "stick with what we have always said and… back down [on] subsidies." *Id.*

54.     Specifically, Nevada SB 374 mandated that Nevada shift from a regime of highly subsidized but capped net metering to an uncapped system of tariffs to be proposed by Nevada's electric utilities and approved by the state Public Utilities Commission ("PUC"), with the aim of ending unreasonable subsidies for rooftop solar customers. In an August 17, 2015 petition before the Nevada PUC, TASC stated that it "and its members Sunrun and SolarCity participated extensively at the 2015 Nevada Legislative Session and were involved in the discussions that surrounded SB 374."[5]

55.     The final version of SB 374 was enacted by the Nevada legislature on June 1, 2015 and signed by the Nevada Governor Brian Sandoval on June 5, 2015. It left no doubt

---

[5] *See* http://pucweb1.state.nv.us/PDF/AxImages/DOCKETS_2015_THRU_PRESENT/2015-7/4945.pdf

that Nevada would cut solar net metering subsidies.  SB 374 expressly authorized electric utilities to "establish just and reasonable rates and charges to avoid, reduce or eliminate an unreasonable shifting of costs from customer-generators to other customers of the utility," and expressly prohibited approval of any tariffs, rates or charges "that unreasonably shift costs from customer-generators to other customers of the utility." SB 374 required that electric utilities propose net metering tariffs consistent with the new law by July 31, 2015, and that the Nevada PUC issue a final ruling on the proposed tariffs by December 31, 2015. SB 374 also allowed electric utilities to impose rates upon net metering customers that were based upon the time of day, week or year, which was previously prohibited.  Industry publication *SmartGrid Today* described SB 374 as a "bill to make PV [photovoltaic solar] customers pay more" and "a bill to let the state's PUC impose added charges on solar PV customers."[6]

56.    Sunrun retaliated with personal attacks on Governor Sandoval.  On July 21, 2015, Sunrun issued a records request for text messages between the Governor and utility industry lobbyists, insinuating that he had something "to hide."  Sunrun's antagonism of Sandoval apparently stemmed from the fact that two of Governor Sandoval's closest advisers, Pete Ernaut and Greg Ferraro, had served as lobbyists for Nevada's largest utility company, NV Energy, and Governor Sandoval himself was once an attorney for a utility shareholders group.  Approximately two weeks before Sunrun's IPO, Sunrun VP Miller told the Las Vegas Sun that the solar industry was "caught in the crosshairs of Sandoval's cronyism."[7]

57.    As required by SB 374, on July 31, 2015, NV Energy submitted a tariff proposal to reduce inequitable net metering subsidies.  The proposal sought a complete overhaul of residential rates for net metering customers, and was extremely unfavorable for Sunrun and its customers.

58.    In addition to the net metering subsidies which were unquestionably threatened

---

[6] *See* https://www.smartgridtoday.com/Nevada-Senate-Oks-bill-to-make-PV-users-pay-more.cfm

[7] *See* http://lasvegassun.com/news/2015/jul/21/solar-company-alleges-cronyism-among-sandoval-admi/

1   by SB 374, another incentive designed to encourage rooftop solar in Nevada was scheduled to

2   lapse at the end of 2015.  Nevada employs renewable portfolio standards ("RPS"), under

3   which state-licensed utilities must derive a certain percentage of their electricity from

4   renewable sources.  As a boondoggle to the solar industry, Nevada had agreed to apply a 2.45-

5   to-1 multiplier for electricity sourced from solar rooftop systems through net metering, but

6   only through 2015.  There were no provisions to extend or renew that multiplier after its

7   scheduled sunset at the end of 2015.

8              **b.  California threatens TOU and other restrictions**

9        59.    California was by far Sunrun's largest market.  Although not growing as

10  quickly as Nevada, Sunrun's Registration Statement credited California for the majority of its

11  sales.

12       60.    At the time of Sunrun's IPO, California's solar industry was bracing for

13  changes in the net metering regime.  California bill AB 327, which was enacted prior to

14  Sunrun's IPO, specified that California's initial net metering regime ("NEM 1.0") would

15  lapse to new customers once certain caps were reached, or by July 2017 at the latest.  The bill

16  also directed the California Public Utility Commission to propose a successor net metering

17  program ("NEM 2.0") no later than December 31, 2015. While the final details of the

18  proposal were not known in the summer of 2015, "the solar industry expect[ed] that NEM 2.0

19  [would] reduce the value of energy produced by PV systems compared to NEM 1.0."[8]

20       61.    California historically had a rate structure where residential users were steeply

21  "tiered" based on the amount of electricity they used, with high volume users charged higher

22  per-kWh rates than low volume users (like those with solar rooftop systems).  As a result of

23  this steep tiering, high-use customers subsidized low-use customers.

24       62.    On April 21, 2015, in response to rate change proposals by the California's

25  major investor-owned utilities, an administrative judge issued a proposed decision finding that

26  "that fewer tiers and ***more cost-based rates are appropriate*** for both default and TOU [time of

27

28  _____
[8] *See* http://www.sagerenew.com/press/the-coming-solar-bubble

use] rates."[9]  The decision noted that "California's electricity needs have changed over the last decade" and that ***new TOU rates must consider "the deepening afternoon valleys resulting from increased deployment of solar.***"[10]

### c. Arizona imposes solar fees and prohibits deceptive sales practices

63.   In 2013, Arizona's Corporation Commission approved a \$.70 per kilowatt surcharge to rooftop solar owners serviced by the state's largest electric utility, APS, to remain in effect until the next rate action scheduled for 2015.  According to Sunrun VP Bryan Miller, the charge (amounting to a \$4.90 monthly fee for a homeowner with an average 7-kw rooftop system) would "hamper the industry." *See* www.greentechmedia.com/articles/read/Charging-a-Fee-to-Solar-Owners-Preserves-Net-Metering-in-Arizona.

64.   Clean energy think tank Energy & Policy Institute described Arizona's fee as the most significant attack on net metering nationwide at that time (until eclipsed by Nevada SB 374):

> There is perhaps no greater attack on net metering ongoing than that being unleashed by the utility industry in Arizona. Starting in 2013, Arizona Public Service (APS), the state's largest utility, admitted that it had paid a Koch-funded group (60 Plus Association) to run anti-solar ads after denying it was funding the campaign earlier in the year. Sean Noble, who has been described as the "wizard behind the screen" in the Kochs' donor network, was running the coordinated attack on net metering at the time. This campaign led up to a November 2013 regulatory hearing on APS' proposal to charge net metering customers between \$50 and \$70 per month. Regulators ultimately ruled that the utility could charge 70 cents per kilowatt, which comes out to a \$5 per month fee.[11]

65.   Energy consultancy Black & Veatch agreed that Arizona's solar fee had significant ramifications that could have a "cascading effect" on other states: "the precedent is a signpost for the regulatory landscape as it wrestles with distributed generation… When you

---

[9] All emphasis in bold and italics is added, unless otherwise noted.

[10] *See* http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M151/K305/151305677.PDF

[11] *See* http://www.energyandpolicy.org/renewable-energy-state-policy-attacks-report-2015/arizona-net-metering-attacks/

1    think about the number of regulatory commissioners, it's really a small community, and when

2    you have a decision such as this from a state like Arizona, other commissions can see a

3    contrasting perspective on the discussion and its ramifications."[12]

4           66.    In late 2014, Sunrun and its fellow solar leasing companies also came under

5    heavy fire from Arizona federal and state legislators for deceptive sales practices.   On

6    November 19, 2014, four members of the United States Congress (including three Arizona

7    Representatives) asked Richard Cordray, Director of the Consumer Finance Protection

8    Bureau, to "be vigilant in protecting consumers from any misleading sales practices."  They

9    noted that "many Americans are drawn into the solar market by the promise of a zero-money-

10   down solar lease….The initial attractiveness of a 'no money down' long-term lease may

11   incentivize the installation of rooftop solar. However, as was the case with the subprime

12   mortgage crisis – easy initial financial terms, increased demand and a rapidly expanding

13   industry can be high. Risk and ultimately harmful to consumers and the industry." The

14   Representatives were particularly concerned with the alleged savings quoted to customers:

15   "customers are quoted savings each month on their utility bills. However, who calculates

16   those estimations and are they accurate?" *See* November 19, 2014 Letter from Representatives

17   Kirkpatrick,        Green,        Sinema        and        Barber,        available        at

18   http://www.publicpower.org/files/PDFs/AZ%20Solar%20Letter.pdf.

19          67.    On December 12, 2014, ten additional members of Congress (including three

20   other Arizona Representatives) wrote Edith Ramirez, the Chairwoman of the Federal Trade

21   Commission, to express concern over "the possibility that these third party leasing companies

22   may be utilizing deceptive marketing strategies that overstate the savings the homeowner will

23   receive, while understating the risks associated with agreeing to a decades-long lease…a

24   financial commitment that will likely exceed both the life of the roof and duration of the

25   lessor's home ownership." *See* Letter from Representatives Gosar, Salmon, Franks, Smith,

26   Miller, Lummis, McKinley, Harris, Brooks, Griffith, Poe, and Nunnelee, available at

27   _____

28   [12] *See* http://bv.com/Home/news/solutions/energy/ awaii -says-net-metered-utility-customers-
     must-pay

1   gosar.house.gov/sites/gosar.house.gov/files/Final%20Signed%2012%2012%2014%20letter%

2   20to%20the%20FTC%20regarding%20third-party%20rooftop%20solar%20leases.pdf.

3        68.     Also in December 2014, the Arizona Corporate Commission launched an

4   investigation into improper marketing practices by solar leasing companies.

5        69.     In early 2015, the Arizona legislature began debate on SB 1465, a consumer

6   protection law aimed at curbing deceptive practices in the marketing of residential solar

7   leases.   On February 19, 2015, TASC (Sunrun's lobbying group) placed a full page

8   advertisement in *The Arizona Republic*, claiming that SB 1465 would "regulate our industry

9   out of the state."[13] According to Arizona State Senator Debbie Lasko, Sunrun and its

10  sometimes competitor SolarCity deluged lawmakers in an attempt to thwart the legislation.[14]

11  Sunrun's heavy-handed tactics failed.  On March 30, 2015, SB 1465 was signed into law.

12       70.     By Spring of 2015, Arizona's major utilities had all proposed additional

13  challenges to net metering, all of which were designed to lower the credits to net metering

14  customers or increase the fees that they paid.[15]  While the Arizona Corporation Commission

15  decided in June 2015 that these challenges should be considered in the context of a full rate

16  action rather than as piecemeal determinations, the message was clear: solar subsidies in

17  Arizona were under attack.

18       **d.  Hawaii proposes to end net metering**

19       71.     On January 20, 2015, Hawaii's largest electric utility, Hawaii Electric, filed a

20  proposal to end net metering and replace it with a tariff structure that was far less

21  advantageous to owners and lessors of rooftop solar systems.[16] The proposal noted that the

22  high level of distributed generation was creating technical problems, and the enormous

23  subsidies were inequitable to non-solar consumers.  *Id.*

24  ---

[13] *See* http://www.azenergyfuture.com/aps-responds-to-tasc-ad/

25  [14] *See* http://www.newsmax.com/US/Elon-Musk-SolarCity-liens-legislators/2015/04/15/id/
26  638795/

[15]*See* http://eq-research.com/blog/az-heres-a-cheat-sheet-of-pending-net-metering-proposals/
27
[16] *See* http://dms.puc.hawaii.gov/dms/DocumentViewer?pid=
28  A1001001A15A20B13419D27829

72.     On July 6, 2015, GreenTech Media published a report by Mina Morita, former Chair of Hawaii's PUC and Former Chair of the Energy Committee of its House of Representatives, and by Marco Mangelsdorf, Founder of the Hawaii PV Coalition, entitled "Its Time To End Net Metering In Hawaii."  The report concluded that *"now is the time to bring the NEM program to a close and transition to a more fair and equitable rate structure."*  While the report assessed the impact on consumers as minimal, it concluded that *"the third-party-owned/financed residential solar transactions…will take a much more significant hit.* Witness the vigorous lobbying of mainland-based companies – SolarCity, Sunrun, Vivint Solar and the like – which have done quite well in Hawaii peddling that type of financing option to tens of thousands of homeowners."[17]

## DEFENDANTS SELL SUNRUN SHARES TO INVESTORS VIA A MATERIALLY FALSE AND MISLEADING REGISTRATION STATEMENT

73.     On or about March 27, 2015, Sunrun filed with the SEC a draft registration statement on Form DRS.

74.     Shortly thereafter, staff from the SEC's Division of Corporate Finance raised questions with Defendants regarding the failure of the initial draft registration to provide meaningful quantification of the states in which its business was concentrated.  On April 23, 2015, the SEC sent a letter to Defendants Sunrun and Jurich requesting, *inter alia*, that the Company "quantify the portion of your sales and installations that were in California and Hawaii so that investors might have a better understanding of the risk."  In response to this letter, in a May 13, 2015, the Company told the SEC that, besides California, "no other state represents a material portion of the Company's sales and installations."  The Company subsequently stripped a reference to Hawaii as a concentrated state, and declined to quantify the sales in Nevada or any state other than California in subsequent draft registration statements or actual registration statements.

75.     On June 25, 2015, the Company filed its first actual registration statement with

---

[17] *See* www.greentechmedia.com/articles/read/Its-Time-to-End-Net-Energy-Metering-in-Hawaii

1   the SEC on Form S-1 (Registration No. 333-205217).  This registration statement was

2   subsequently amended on July 22, 2015 (as amended, the "Registration Statement").  Both the

3   original and amended registration statements contained a preliminary prospectus, which

4   contained substantially similar information to the registration statement.

5       76.     On July 31, 2015, Sunrun sent to the SEC a letter requesting that the SEC

6   accelerate approval of its registration statement to August 4, 2015 at 4:00 p.m.  The July 31,

7   2015 letter expressly acknowledged that:

8           •   "should the Commission or the Staff, acting pursuant to delegated

9           authority, declare the Registration Statement effective, it does not foreclose the

10          Commission from taking any action with respect to the Registration Statement;"

11          •   "the action of the Commission or the Staff, acting pursuant to delegated

12          authority, in declaring the filing effective, does not relieve the Company from its full

13          responsibility for the adequacy and accuracy of the disclosure in the Registration

14          Statement;" and

15          •   "the Company may not assert Staff comments and the declaration of

16          effectiveness as a defense in any proceeding initiated by the Commission or any

17          person under the federal securities laws of the United States."

18      77.     Pursuant to the Company's acceleration request and the acknowledgments

19  undertaken by the Company in the July 31, 2015 letter, the SEC declared the Registration

20  Statement effective at 4:00 p.m. on August 4, 2015.  The following day, the Company filed

21  with the SEC the final prospectus for the IPO (the "Prospectus"), which forms part of the

22  Registration Statement, and completed the IPO in which 17.9 million shares of Sunrun

23  common stock were sold to the investing public at $14.00 per share.

24      78.     The Registration Statement and Prospectus were, at a minimum, negligently

25  prepared and, as a result, contained untrue statements of material facts or omitted to state

26  other facts necessary to make the statements made not misleading.  They were not prepared in

27  accordance with the rules and regulations governing their preparation.

28      79.     SEC Regulation S-K requires that issuers include certain information in

registration statements and prospectuses, and comply with certain standards in presenting that information.  With respect to trends affecting the business, Item 303 of Regulation S-K, 17 C.F.R. §229.303, requires issuers to "Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  With respect to projections included in a registration statement or prospectus, Item 10 of Regulation S-K, 17 C.F.R. § 229.10, provides that management of an issuer "must have a reasonable basis for such an assessment."

80.    Additionally, even where SEC regulations do not require an issuer to affirmatively address a topic in a registration statement or prospectus, an issuer that does choose to discuss a topic must do so completely and accurately so as to avoid misleading investors.  Section 11 of the Securities Act prohibits a registration statement from "omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Section 12(a)(2) of the Securities Act similarly prohibits a prospectus from omitting "to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."

81.    The Registration Statement and Prospectus twice incorrectly stated that: "We focus our resources on markets with high electricity rates, ***favorable policy environments,*** and other characteristics that allow for low operational costs and favorable unit margins."  This statement was materially false when made because Sunrun's most important markets were not "favorable policy environments," and because the statement omitted the following information necessary to make the discussion of "policy environments" not misleading under the circumstances in which it was made: (a) Sunrun's most important growth market, Nevada, had before the IPO enacted legislation requiring that net metering be reformed to end unreasonable subsidies; (b) prior to the IPO, Nevada had also scheduled to sunset another important subsidy, a 2.45x RPS credit multiplier provided for purchases of solar electricity generated by residential rooftop systems; (c) the policy environment in Nevada had not only become unfavorable, but hostile, driven in part by Sunrun's personal attacks on Nevada

Governor Brian Sandoval; (d) Sunrun's largest market in absolute terms, California, had before the IPO decided to reform net metering and was considering a series of proposals including fixed fees and/or time-of-use charges that were decidedly adverse to solar leasing companies like Sunrun; (e) Hawaii, another important market for Sunrun with heavy solar penetration, at the time of its IPO, was actively considering replacing its net metering system with a disadvantageous tariff regime; (f) the "policy environment" in Hawaii was so unfavorable that even Sunrun's competing solar installers called for the end of net metering; (g) Arizona had approved crippling fees on solar customers that Sunrun VP Bryan Miller said would hamper the solar industry, and while those fees were vacated until broader reconsideration of electric rates, Arizona's utilities had all proposed disadvantageous reforms by Spring of 2015; (h) more than a dozen members of the United States Congress had asked the United States Federal Trade Commission and/or the United States Consumer Financial Protection Bureau to consider clamping down on deceptive sales practices from residential solar leasing companies; and (i) Arizona had already enacted consumer protection legislation addressing residential solar leasing sales practices that Sunrun's lobbying arm, TASC, contended would "regulate our industry out of the state."

82.     The Registration Statement and Prospectus stated the following with respect to risks related to net metering:

**We rely on net metering and related policies to offer competitive pricing to homeowners in all of our current markets, and changes to net metering policies may significantly reduce demand for electricity from our solar service offerings.**

… Utilities, their trade associations, and fossil fuel interests in the country are currently challenging net metering policies, and seeking to either eliminate it, cap it, or impose charges on homeowners that have adopted net metering. Some states, including California, currently set limits on the total percentage of a utility's customers that can adopt net metering. Maryland, Nevada and New York also have metering caps and other states we serve now or in the future may adopt metering caps. If the net metering caps in California or other jurisdictions are reached without an expansion of net metering policies, homeowners in the future will be unable to recognize the cost savings associated with net metering they currently enjoy. *Of the states in which we offer our solar service offerings, only Nevada is expected to reach its cap within the next 12 months unless the cap is increased.* We currently expect Nevada to reach its cap in the next month unless it is increased. *However, legislation has been adopted that requires*

*that an uncapped program approved by the Nevada Public Utilities Commission be implemented in Nevada no later than December 31, 2015.* If changes to net metering policies occur without grandfathering to existing homeowners, those existing homeowners could be negatively impacted which could create a default risk from those homeowners. Our ability to sell our solar service offerings may be adversely impacted by the failure to expand existing limits to net metering. The failure to adopt a net metering policy where it currently is not in place would pose a barrier to entry in those states. Additionally, the imposition of charges that only or disproportionately impact homeowners that utilize net metering would adversely impact our business.

83.     The statements identified in Paragraph 82 above did not constitute meaningful risk warnings and were materially false and misleading, in that they affirmatively misstated that Nevada had required an uncapped net metering program by December 31, 2015, when in fact Nevada had by statute required that the net metering program be replaced entirely with a tariff regime that eliminated all unreasonable subsidies, and because the statements omitted the following material information necessary to make the statements not misleading under the circumstances in which they were made: (a) prior to the IPO, Nevada had also scheduled to sunset another important subsidy, a 2.45x RPS credit multiplier provided for purchases of solar electricity generated by residential rooftop systems; (b) the policy environment in Nevada had not only become unfavorable, but hostile, driven in part by Sunrun's personal attacks on Nevada Governor Brian Sandoval; (c) Sunrun's largest market in absolute terms, California, had before the IPO decided to reform net metering and was considering a series of proposals including fixed fees and/or time-of-use charges that were decidedly adverse to solar leasing companies like Sunrun, and in particular its core PPA product; (d) Hawaii, another important market for Sunrun with heavy solar penetration, at the time of its IPO, was actively considering replacing its net metering system with a disadvantageous tariff regime; (e) the "policy environment" in Hawaii was so unfavorable that even Sunrun's competing solar installers called for the end of net metering; and (f) Arizona had approved crippling fees on solar customers that Sunrun VP Bryan Miller said would hamper the solar industry, and while those fees were vacated until broader reconsideration of electric rates, Arizona's utilities had all proposed disadvantageous reforms by Spring of 2015, including reforms that would

eliminate or impair net metering.

84.     The Registration Statement and Prospectus compounded the misleading statements about Nevada by omitting material information regarding the importance of that market to the Company's growth.  The Registration Statement and Prospectus stated that Sunrun "currently provides solar energy services in Arizona, California, Delaware, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, Nevada, New Hampshire, New Jersey, New York, Oregon, Pennsylvania and South Carolina, as well as the District of Columbia," and stated elsewhere that Sunrun's "business [was] concentrated in certain markets" but identified only California as a state in which it had concentrated business.  These statements were materially false and misleading when made because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (a) that Nevada was an extremely important and concentrated market for Sunrun at the time of the IPO; (b) that Nevada was Sunrun's fastest growing major market at the time of the IPO; and (c) that Nevada was of particular strategic importance because, prior to the reduction in unreasonable subsidies required by Nevada SB 374, Nevada had been an extremely low-cost market.

85.     The Registration Statement and Prospectus each prominently proclaimed that "Our customers lock in long term savings."  This statement was materially false and misleading when made because Sunrun's customers did not "lock in" any savings, but instead paid varying charges, tariffs and/or fees for electricity to Sunrun and their local electric utility that, at any given point during the 20-year life of a Sunrun PPA, might or might not provide savings relative to what the customer would otherwise pay.

86.     Similarly, the Registration Statement and Prospectus claimed that Sunrun's core PPA offerings "provide[d] homeowners with simple, ***predictable pricing*** for solar energy ***that is insulated from rising retail electricity prices.***" This statement was materially false and misleading when made because it omitted that contracting with Sunrun would do nothing whatsoever to make the customer's overall electric bill "predictable" or "insulated from rising retail electricity prices," information which was necessary to make the statement not

misleading under the circumstances in which it was made.  Instead, Sunrun forced most PPA customers to contract both with it and with local electric utilities, exposing them to solar charges, fees and tariffs that they never had to pay before, and adding no long-term stability to their electric costs.

87.     The Registration Statement and Prospectus purported to describe Sunrun's legal proceedings as consisting only of a 2012 investigation by Department of Treasury and Department of Justice into the solar development industry regarding a grant program for pre-2012 installations, a 2013 California consumer rights class action regarding contractor licensing laws, and an Arizona lawsuit in which Sunrun was involved challenging an Arizona tax determination involving residential solar panels.  These statements were materially false and misleading when made, because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (a) Sunrun had initiated proceedings in Nevada under that state's public record laws, which Sunrun VP Bryan Miller told the press related to purported "cronyism" by the Nevada Governor Brian Sandoval impacting the residential solar industry and Nevada net metering; (b) Sunrun, either by itself and through its lobbying front TASC, had intervened in legal proceedings before public utility commissions in Nevada and other states in which Sunrun operated, which proceedings were likely to have a material impact on Sunrun's operations in those states; and (c) through TASC, Sunrun had initiated litigation even in states in which it did not currently operate, like Wisconsin.

88.     The Registration Statement and Prospectus instructed investors only to look at those documents and exhibits thereto for information about Sunrun and its stock.  Neither document instructed investors to consider the information contained on any regulatory docket as additional information relevant to Sunrun's IPO.  Moreover, both documents explicitly discouraged investors from looking even to Sunrun's own website for additional information, stating that the website was "not part of the prospectus," and did not identify any other source from which investors could ascertain additional information relevant to the offering:

WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of our common stock offered by this prospectus. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement, as permitted by the rules and regulations of the SEC. For further information with respect to us and our common stock, we refer you to the registration statement, including the exhibits filed as a part of the registration statement. Statements contained in this prospectus concerning the contents of any contract or any other document is not necessarily complete. If a contract or document has been filed as an exhibit to the registration statement, please see the copy of the contract or document that has been filed. Each statement is this prospectus relating to a contract or document filed as an exhibit is qualified in all respects by the filed exhibit. You may obtain copies of the exhibits by mail from the Public Reference Section of the SEC, 100 F Street, N.E., Room 1580, Washington, D.C. 20549, at prescribed rates or view them online. You may obtain information on the operation of the public reference rooms by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet website that contains the registration statement of which this prospectus forms a part, as well as the exhibits thereto. These documents, along with future reports, proxy statements and other information about us, are available at the SEC's website, www.sec.gov.

As a result of this offering, we will become subject to the information and reporting requirements of the Exchange Act and, in accordance with this law, will file periodic reports, proxy statements and other information with the SEC. These periodic reports, proxy statements and other information will be available for inspection and copying at the SEC's public reference facilities and the website of the SEC referred to above. We also maintain a website at www.sunrun.com. Upon the completion of this offering, you may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on our website is not a part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

89.     With these misrepresentations and omissions in the Registration Statement, Defendants were able to successfully sell 17.9 million shares of Sunrun common stock to the investing public, raising $250.6 million in gross proceeds (approximately $234.3 million net of underwriting fees and IPO costs). Of this, the Company sold 17,482,268 shares, receiving $228,842,888 in gross proceeds and the Selling Stockholders collectively sold another 417,7732 shares, receiving $5,468,112 in gross proceeds.

90.     Following Sunrun's IPO, the price of Sunrun common stock declined substantially as risks concealed by Sunrun's Registration Statement misrepresentations and omissions became evident, and investors learned that the Company was not actually conducting its business in a "favorable policy environment" or providing "predictable"

1    pricing to its customers.

2        91.    On August 6, 2015, the day after Sunrun's IPO, Sunrun lobbying front TASC

3    told Greentech Media that the tariff proposed by NV Energy pursuant to SB 374 in July 2015

4    – *before Sunrun's IPO* – was, in fact, disastrous for Sunrun.    According to a TASC

5    spokesperson, "NV Energy's proposal would mean the certain end of Nevada's rooftop solar

6    industry, which is number one in the nation in solar jobs per capita… It would be tragic if

7    Governor Sandoval's Public Utilities Commission allows Nevada to go from number one in

8    solar job creation, to number one in solar job elimination."[18]

9        92.    The following week, Nevada PUC rejected a TASC proposal to allow full net

10   metering subsidies to continue until year, indicating that the SB 374 legislation enacted in

11   May 2015 prohibited such extension.[19]

12       93.    On October 12, 2015, the Hawaii PUC voted to end net metering in that state,

13   and to replace those subsidies with a "market based structure."[20]

14       94.    On December 22, 2015, Nevada PUC adopted a proposed order on net

15   metering that, although structured differently from the July 31, 2015 NV Energy proposal,

16   similarly reduced unreasonable net metering subsidies in Nevada, as SB 374 required.

17   According to *The Las Vegas Sun,* the proposed order "would reduce by 75 percent the amount

18   NV Energy pays customers for excess power their solar panels produce and change the flat

19   service rate for customers with solar panels…The exact amounts of the changes haven't been

20   decided, but solar companies say they expect their customers' base service charge to

21   ultimately double or triple.  The decision is a blow for rooftop solar companies, which count

22   on the net metering credits to make solar economically advantageous for customers."[21]

[18] *See* http://www.greentechmedia.com/articles/read/Solar-Net-Metering-Conflict-Flares-up-Again-in-Nevada

[19] *See* http://www.reviewjournal.com/business/energy/puc-rejects-bid-continue-net-metering-program

[20] *See* http://www.greentechmedia.com/articles/read/hawaii-regulators-shutdown-hecos-net-metering-program

[21] *See* https://lasvegassun.com/news/2015/dec/22/regulators-deal-a-blow-to-rooftop-solar-industry/

1    95.    On January 7, 2016, Sunrun issued a press release announcing that it would

2 cease conducting business in Nevada because the Nevada PUC had cut net metering subsidies

3 (just as SB 374 required it to).

4    96.    On January 28, 2016, California decided to retain net metering, but mandated

5 that straight metering be converted to time-of-use metering no later than 2018 and allowed

6 "non-bypassible charges."   On February 4, 2016, EnerTuition published an analysis of the

7 reform's impact on residential rooftop lease and PPA companies, including Sunrun.

8 EnerTuition concluded that the measures would slash the total addressable market for

9 lease/PPA, and that the decision was "very negative to the lease/PPA industry and threatens

10 the survival of lease/PPA companies such as SCTY and RUN."[22]

11    97.    On March 10, 2016, after the close of trading, Sunrun issued a press release

12 and filed the same with the SEC on Form 8-K reporting disappointing fiscal 2015 results.

13 Specifically, the Company admitted that it had failed to meet revenue guidance because of its

14 exit from Nevada.  The Company also admitted that it had experienced "compression" in its

15 expected net present value per watt installed, "due to [its] exit from Nevada," a low cost

16 market.

17    98.    In a conference call that afternoon, the Company told investors for the first

18 time exactly how concentrated the Company had become in Nevada.  Defendant Jurich

19 conceded that leaving Nevada due to the net metering change stripped "approximately 12

20 megawatts of backlog."  She warned: "As a result, in the next quarter, we will install 56

21 megawatts… down 18% from Q4." Later in the call she conceded that the impact would

22 likely be even worse: "The cancellation we're going to take in Nevada, we will likely take a

23 larger cancellation against our bookings in Nevada than the 12 megawatts."  Defendant

24 Komin conceded that the Nevada market was important to Sunrun both because of its

25 enormous growth, where "volume grew from almost zero to reach about 20% of Sunrun-built

26 deployment over only a few quarters" and because it was "one of our lowest cost regions."

27

28 _____

[22] *See* http://seekingalpha.com/article/3865416-california-net-metering-successor-tariff-yet-another-nail-lease-ppa-business-model-coffin

1   The Company had not disclosed the significance of the Nevada market in its Registration

2   Statement and Prospectus.  In the question-and-answer segment of that call, Analyst Patrick

3   Jobin from Credit Suisse emphasized that Nevada's importance to Sunrun had not been

4   disclosed, stating: "20% exposure for deployments in Nevada was higher than at least I was

5   expecting."

6       99.     The price of Sunrun common stock has plummeted since the IPO and now

7   trades below $7 per share, *or less than half* of the $14 per share price the stock was sold to

8   investors during the IPO.

9                       **CLASS ACTION ALLEGATIONS**

10      100.    Plaintiff brings this action as a class action on behalf of all those who

11  purchased Sunrun common stock pursuant or traceable to the Registration Statement issued in

12  connection with the IPO (the "Class"). Excluded from the Class are defendants and their

13  families, the officers, directors and affiliates of defendants, at all relevant times, members of

14  their immediate families and their legal representatives, heirs, successors or assigns and any

15  entity in which defendants have or had a controlling interest.

16      101.    The members of the Class are so numerous that joinder of all members is

17  impracticable.  While the exact number of Class members is unknown to Plaintiff at this time

18  and can only be ascertained through appropriate discovery, Plaintiff believes that there are

19  hundreds of members in the proposed Class.  Plaintiff notes that Sunrun's March 11, 2016

20  annual report to the SEC on Form 10-K indicates that it has 211 holders of record, a figure

21  which excludes all holders "in street name."  Most retail investors hold stock "in street name."

22  Plaintiff further notes that the July 31, 2015 acceleration letter furnished by the Underwriter

23  Defendants to the SEC indicates that the Underwriter Defendants had, by that date, already

24  disseminated 2,043 copies of the Prospectus to investors.

25      102.    Record owners and other members of the Class may be identified from records

26  maintained by Sunrun or its transfer agent and may be notified of the pendency of this action

27  by mail, using the form of notice similar to that customarily used in securities class actions.

28      103.    Plaintiff's claims are typical of the claims of the members of the Class as all

1   members of the Class are similarly affected by defendants' wrongful conduct in violation of

2   federal law that is complaint of herein.

3       104.    Plaintiff will fairly and adequately protect the interests of the members of the

4   Class and has retained counsel competent and experienced in class and securities litigation.

5       105.    Common questions of law and fact exist as to all members of the Class and

6   predominate over any questions solely affecting individual members of the Class. Among the

7   questions of law and fact common to the Class are:

8       (a) whether defendants violated the Securities Act;

9       (b) whether the Registration Statement and Prospectus statements identified above

10         misrepresented or omitted material facts about the business and operations of

11         Sunrun, the subsidies available to Sunrun and its customers, Sunrun's geographic

12         concentration, and legal proceedings involving the Company;

13      (c) whether any of the non-issuer defendants have a due diligence defense to liability

14         under the Securities Act; and

15      (d) to what extent the members of the Class have sustained damages and the proper

16         measure of damages.

17      106.    A class action is superior to all other available methods for the fair and

18  efficient adjudication of this controversy since joinder of all members is impracticable.

19  Furthermore, as the damages suffered by individual Class members may be relatively small,

20  the expense and burden of individual litigation make it impossible for members of the Class to

21  individually redress the wrongs done to them. There will be no difficulty in the management

22  of this action as a class action.

23                 **FIRST CAUSE OF ACTION**

24              **For Violation of §11 of the Securities Act Against**

        **Sunrun, the Individual Defendants and the Underwriter Defendants**

25

26      107.    Plaintiff incorporates by reference ¶¶ 1-106 above as if fully alleged herein.

27      108.    This Cause of Action is brought pursuant to § 11 of the Securities Act, 15

28  U.S.C. §77k, on behalf of the Class, against Sunrun, the Individual Defendants and the

1   Underwriter Defendants.

2     109. The Registration Statement for the IPO was inaccurate and misleading,

3   contained untrue statements of material facts, omitted to state other facts necessary to make

4   the statements made not misleading, and omitted to state material facts required to be stated

5   therein. Specifically, as is further detailed above, the Registration Statement: (a)

6   misrepresented and omitted material information regarding net metering and other subsidies

7   in Nevada, Hawaii, Arizona, and California; (b) failed to disclose scrutiny the Company was

8   facing for improper sales practices, especially in Arizona, and regulation imposed in reaction

9   to improper solar leasing sales practices; (c) failed to disclose the full scope of the legal

10  proceedings in which the Company was involved; and (d) falsely suggested that the Company

11  eliminated pricing risk for its customers or made their electric costs predictable, when it did

12  not.

13    110. The defendants named in this Cause of Action are strictly liable to Plaintiff and

14  the Class for the misstatements and omissions in the Registration Statement.

15    111. None of the defendants named herein made a reasonable investigation or

16  possessed reasonable grounds for the belief that the statements contained in the Registration

17  Statement were true and without omissions of any material facts and were not misleading.

18    112. By reason of the conduct herein alleged, each defendant named herein violated

19  §11 of the Securities Act.

20    113. Plaintiff acquired Sunrun common stock in, or traceable to, the IPO.

21    114. This action was filed within one year after the time that Plaintiff discovered or

22  reasonably could have discovered the misrepresentations alleged herein.

23    115. Plaintiff and the Class have sustained damages. The value of Sunrun common

24  stock has declined substantially.

25    116. At the time of their purchases of Sunrun common stock, Plaintiff and other

26  members of the Class were without knowledge of the facts concerning the wrongful conduct

27  alleged herein. Less than one year has elapsed from the time that Plaintiff discovered or

28  reasonably could have discovered the facts upon which this complaint is based to the time that

1   Plaintiff commenced this action. Less than three years have elapsed between the time that the

2   securities upon which this Cause of Action is brought were offered to the public and the time

3   Plaintiff commenced this action.

4                                    **SECOND CAUSE OF ACTION**

5                    **For Violation of §12(a)(2) of the Securities Act Against
                           the Underwriter Defendants**

6

7        117.    Plaintiff incorporates by reference ¶¶ 1-106 above as if fully alleged herein.

8        118.    By means of the defective Prospectus, the Underwriter Defendants promoted

9   and sold Sunrun stock to Plaintiff and other members of the Class.

10       119.    Purchases in the IPO can be readily ascertained from the previously-filed

11  certifications of the Plaintiff and other trading records for members of the Class.  Specifically,

12  purchases from the IPO itself will reflect a purchase price of $14.00 and a trade date in

13  August 2015 (trade date may vary slightly depending on reporting of each broker).  Such

14  $14.00 purchases necessarily reflect IPO transactions because Sunrun shares never traded at

15  that price in the open market during the month of August 2015, or at any time during the

16  Class Period.

17       120.    The Prospectus contained untrue statements of material fact, and/or concealed

18  or failed to disclose material facts.  Specifically, as is further detailed above, the Prospectus:

19  (a) misrepresented and omitted material information regarding net metering and other

20  subsidies in Nevada, Hawaii, Arizona, and California; (b) failed to disclose scrutiny the

21  Company was facing for improper sales practices, especially in Arizona, and regulation

22  imposed in reaction to improper solar leasing sales practices; (c) failed to disclose the full

23  scope of the legal proceedings in which the Company was involved; and (d) falsely suggested

24  that the Company eliminated pricing risk for its customers or made their electric costs

25  predictable, when it did not.

26       121.    The Underwriter Defendants owed Plaintiff and the other members of the Class

27  who purchased Sunrun common stock pursuant to the Prospectus the duty to make a

28  reasonable and diligent investigation of the statements contained in the Prospectus to ensure

1  that such statements were true and that there was no omission to state a material fact required

2  to be stated in order to make the statements contained therein not misleading. These

3  defendants, in the exercise of reasonable care, should have known of the misstatements and

4  omissions contained in the Prospectus as set forth above.

5        122.    Plaintiff did not know of the untruths and omissions contained in the Prospectus

6  at the time Plaintiff acquired Sunrun common stock.

7        123.    By reason of the conduct alleged herein, the Underwriter Defendants violated

8  §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff

9  and the other members of the class who purchased Sunrun common stock pursuant to the

10  Prospectus sustained substantial damages in connection with their purchases of Sunrun stock.

11  Accordingly, Plaintiff and the other members of the Class who hold the common stock issued

12  pursuant to the Prospectus have the right to rescind and recover the consideration paid for

13  their shares, and hereby tender their common stock to the Underwriter Defendants. Class

14  members who have sold their common stock seek damages, to the extent permitted by law.

15

16  **THIRD CAUSE OF ACTION**
**For Violation of §15 of the Securities Act Against**
**the Individual Defendants**

17

18        124.    Plaintiff incorporates by reference ¶¶ 1-116 above as if fully alleged herein.

19        125.    This Cause of Action is brought pursuant to §15 of the Securities Act against

20  the Individual Defendants.

21        126.    The Individual Defendants all were control persons of Sunrun by virtue of their

22  positions as directors and/or senior executives of Sunrun.  As Sunrun's Registration Statement

23  and Prospectus conceded, "[u]pon completion of this offering, our executive officers,

24  directors and principal stockholders will continue to have substantial control over us."

25        127.    By virtue of the conduct alleged herein, the Individual Defendants are liable as

26  control persons for the primary violations of Section 11 by Sunrun, as alleged in Count I.

27        128.    The Individual Defendants did not conduct a reasonable investigation or

28  possess a reasonable basis for the belief that the statements contained in the Registration

1 │ Statement and identified in Paragraphs 79 to 89 above were true, were without omissions of

2 │ material fact, and were not misleading.

3 │     129.    Each of the Individual Defendants is liable to Plaintiff and the Class for

4 │ damages suffered as a result of the primary Securities Act violations of Sunrun.

5 │ **PRAYER FOR RELIEF**

6 │     WHEREFORE, Plaintiff prays for relief and judgment, as follows:

7 │     A.    Determining that this action is a proper class action, and certifying Plaintiff as

8 │ a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's

9 │ counsel as Class Counsel;

10 │     B.    Awarding compensatory damages in favor of Plaintiff and the other Class

11 │ members against all defendants, jointly and severally, for all damages sustained as a result of

12 │ defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

13 │     C.    Awarding rescission in favor of Plaintiff, who have tendered their shares, and

14 │ against the Underwriter Defendants;

15 │     D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred

16 │ in this action, including counsel fees and expert fees; and

17 │     E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

18 │ **JURY DEMAND**

19 │     Plaintiff hereby demands a trial by jury.

20 │ Dated: October 21, 2016

21 │     Respectfully submitted,

22 │     **POMERANTZ LLP**

23 │     By: *s/ Joshua B. Silverman__*
   │     Joshua B. Silverman (admitted *pro hac vice*)

24 │     Patrick V. Dahlstrom (admitted *pro hac vice*)

25 │     Ten South La Salle Street, Suite 3505
   │     Chicago, Illinois 60603

26 │     Telephone: (312) 377-1181
   │     Facsimile:  (312) 377-1184

27 │     E-mail: jbsilverman@pomlaw.com
   │     E-mail: pdahlstrom@pomlaw.com

28 │

1

2

3

4

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, California 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

5

6

7

8

9

10

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:(212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

11

*Attorneys for Lead Plaintiff and the Putative Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND LOCAL CIVIL RULE 5-1**

3

I, the undersigned, say:

4
5

I am a citizen of the United States and admitted to practice before this Court, *Pro Hac Vice*.  I am over the age of 18 and not a party to the within action.  My business address is Pomerantz LLP, Ten South La Salle Street, Suite 3505, Chicago, Illinois 60603.

6

On October 21, 2016, I caused to be served the following document:

7
8

**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

9
10

By posting the document to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the parties as reflected on the attached Service List.

11
12

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 21, 2016, at Chicago, Illinois.

13
14

<u>s/ Joshua B. Silverman</u>
Joshua B. Silverman

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**EXHIBIT A**

3

**SERVICE LIST**

4

5

**Adam Christopher McCall**     amccall@zlk.com

6

7

**Adam Marc Apton**     aapton@zlk.com

8

9

**Anna Erickson White**     awhite@mofo.com, avickery@mofo.com

10

11

**Francis A. Bottini , Jr**     fbottini@bottinilaw.com, sammirati@bottinilaw.com

12

13

**James Ian Jaconette**     jamesj@rgrdlaw.com, e_file_sd@rgrdlaw.com

14

15

**Jennifer Pafiti**     jpafiti@pomlaw.com, abarbosa@pomlaw.com, disaacson@pomlaw.com, kmsaletto@pomlaw.com

16

17

**John T Jasnoch**     jjasnoch@scott-scott.com, efile@scott-scott.com, rmcgraw@scott-scott.com

18

19

**Joshua B. Silverman**     jbsilverman@pomlaw.com

20

21

**Laurence M. Rosen**     lrosen@rosenlegal.com, larry.rosen@earthlink.net

22

23

**Robert L Webb**     rwebb@mofo.com, tarmaz@mofo.com

24

25

**Shannon L Hopkins**     shopkins@zlk.com

26

27

**Su-Han Wang**     SWang@mofo.com, GMARTINEZ@MOFO.COM

28