United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CAROLE LEE GREENBERG, Individually
and on Behalf of All Others Similarly
Situated,

              Plaintiff,

  v.

SUNRUN INC., et al.,

              Defendants.
_____/

Case No. 3:16-cv-2480-CRB

**ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE**

      Defendant Sunrun, Inc. ("Sunrun") is a company that leases rooftop solar panels to homeowners.  When Sunrun conducted its initial public offering ("IPO") on August 5, 2015, its future looked bright.  But with a series of regulatory setbacks, things quickly went dark. After she and other investors took heavy losses on Sunrun stock, Plaintiff Carole Greenberg brought this class action against Sunrun, its officers, directors, and underwriters for violations of the Securities Act of 1933.

I.      **BACKGROUND**

     A.    **Sunrise**

      Centralized sources of conventional energy, like coal-fired power plants, have traditionally dominated American energy markets.  Class Action Compl. ("CAC") ¶ 34. These facilities produce energy far from the point consumption and then transmit it to households and business over an interconnected network known as the electrical grid.  CAC ¶ 34.  Centralized sources of renewable energy, like dams or solar farms, have also played a role.  CAC ¶ 34.  More recently decentralized sources of renewable energy, like rooftop solar panels, have taken off.  CAC ¶¶ 35–36.

While utilities in general are highly regulated, solar energy production of all stripes is also often heavily subsidized.  CAC ¶¶ 37–38.  In addition to federal tax credits, some states incentivize the installation of rooftop solar panels through a policy called net metering.  CAC ¶¶ 37–38.  Net metering allows homeowners to sell their excess solar energy back to utility companies, often at full retail rates.  CAC ¶ 42.  But because this arrangement imposes a burden on utility companies, states often cap the number of customers who may participate.  See CAC ¶¶ 42, 51–54, 60.

To compete with utilities, companies that sell or lease solar panels to homeowners often rely on net metering.  CAC ¶ 43.  That means their fortunes depend on state regulatory choices.  CAC ¶¶ 44, 48.  Defendant Sunrun, Inc. ("Sunrun") is no exception.  The company does not, and likely could not, operate in states without favorable net metering rules.  CAC ¶ 44.  For that reason, in 2015 Sunrun operated only in Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Nevada, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, South Carolina, and Washington, D.C.  CAC ¶ 44.  Most of its business was in California but, over only a few quarters, Nevada went from zero to 20% of Sunrun's overall deployment.  CAC ¶¶ 50, 59.  Still, even in friendlier markets regulatory fights do not always go Sunrun's way.  CAC ¶ 48.

**B.    Sunset**

Despite the best efforts of Sunrun's lobbying arm, net metering subsidies came under attack in Nevada, California, Arizona, and Hawaii.  See CAC ¶¶ 48–72.  Nevada historically allowed net metering subsidies but capped the number of consumers who could take advantage of them.  CAC ¶ 51.  Nevada had raised the cap from 1% to 3% but ultimately refused go up to 10%.  CAC ¶ 52.  It then passed Nevada Senate Bill 374 ("SB 374"), allegedly with "the aim of ending unreasonable subsidies for rooftop solar customers."  CAC ¶ 54.  Among other things, the bill dictated that energy utilities "shall . . . offer net metering to customer-generators" but gave a state commission discretion to iron out the details.  SB

2

374 § 2.3(1) (dkt. 62–2).[1]  For example, under SB 374 the commission "[m]ay establish terms and conditions for the participation by customer-generators in net metering, including, without limitation, limitations on enrollment in net metering" and "authorize a utility to establish just and reasonable rates and charges to avoid, reduce, or eliminate an unreasonable shifting of costs from customer-generators to other customers."  Id. §§ 2.3(2)(b), (d).  The bill also made clear that the commission "[s]hall not approve any tariff"—which in this context means a document that defines the relationship between a utility and its customers[2]—or "authorize any rates or charges for net metering" that "unreasonably shift costs from customer-generators to other customers."  Id. § 2.3(2)(e).  What is more, another important subsidy in Nevada was scheduled to sunset at the close of 2015.  CAC ¶ 58.

Changes were on the horizon in California as well.  The state legislature passed a bill that would have the state's net metering regime lapse once certain caps were reached, which was expected to be no later than July 2017.  CAC ¶ 60.  It directed the state's utility commission to propose a successor by the end of 2015, though this arrangement meant that the final details of the new net metering regime could not be known before that time.  CAC ¶ 60.  In April 2015, an administrative judge noted that, in light of "increased deployment of solar" in California, "more cost-based rates are appropriate."  CAC ¶ 62.

In 2013, Arizona approved a surcharge of $0.70 per kilowatt on rooftop solar panel owners, which comes out to roughly $5.00/month for an average user.  CAC ¶ 63.  In late 2014, several members of Congress—many of whom represented Arizona—publicly expressed concerns about deceptive sales practices in the solar panel industry.  CAC ¶¶ 66–67.  And in 2015, the Arizona legislature passed a consumer protection law "aimed at

---

[1]  The Court takes judicial notice of SB 374 because it was "incorporated into the complaint by reference," Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

[2]  It does not mean a tax or surcharge, as one might normally expect.  See "Tariffs," Nevada Public Utilities Commission, NV.gov, (last viewed on Jan. 26, 2017), http://puc.nv.gov/About/Docs/Tariffs/; see also Nev. Admin. Code § 703.375 (defining tariff in energy utility context); id § 703.385 (laying out their required components).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

curbing deceptive practices in the market of residential solar leases."  CAC ¶ 69.  Later that year, many of the state's major utility companies submitted proposals that challenged net metering practices in the state.  CAC ¶ 70.  The state commission deferred making any decisions on the proposals, but Plaintiffs maintain that the message was clear: "solar subsidies in Arizona were under attack."  CAC ¶ 70.

Hawaii's largest electric utility company submitted a proposal to end net metering in 2015.  CAC ¶ 71.  A few months later, a former chair of the energy committee in the state house of representatives published a report urging the same.  CAC ¶ 72.

On August 4, 2015, Sunrun's pre-IPO Registration Statement and Prospectus ("Prospectus") became effective[3]—one day before the company went public.  CAC ¶ 77.  The Prospectus included few specifics about these regulatory developments.  See CAC ¶ 78.  It mentioned that Nevada would soon reach its net-metering cap and that new legislation in Nevada (SB 374) required the state commission to approve "an uncapped program" by the end of 2015—but said nothing about the particular provisions designed to curb unreasonable cost-shifting.[4]  See Prospectus (dkt. 62–1) at 18; CAC ¶¶ 81, 83.

The Prospectus also said that Sunrun focused on markets with "favorable policy environments," Prospectus at 5, 96; CAC ¶ 81, and noted that 58% of its customers were in California, Prospectus at 23; CAC ¶ 84.  It therefore warned that its business was "particularly susceptible" to adverse policy changes there, as well as in "other markets that may become similarly concentrated."  Prospectus at 23–24.  It did not single out high growth and increasing concentration of business operations in Nevada.  CAC ¶ 84.

A graphic near the front of the Prospectus also boasted that Sunrun customers "lock-in long term savings," while its overview section touted "simple, predictable pricing for solar

---

[3]  The Court takes judicial notice of the Prospectus because it too was "incorporated into the complaint by reference," Tellabs, 551 U.S. at 322.

[4]  That said, the Prospectus warned that if "changes to net metering policies occur without grandfathering to existing homeowners," it "could create a default risk from those homeowners." Prospectus at 18.

United States District Court
For the Northern District of California

energy that is insulated from rising retail electricity prices."  Prospectus graphic #3;
Prospectus at 1; CAC ¶ 86.  And as required by law, the Prospectus alerted investors to
ongoing legal proceedings in which Sunrun was involved.  CAC ¶ 87.  Although it discussed
investigations by the Treasury and Justice Departments into a 2012 solar energy grant
program, a 2013 California consumer class action about contractor licensing laws, and
Sunrun's own effort to challenge a tax decision in Arizona, the Prospectus did not discuss
(1) Sunrun's efforts to obtain information under Nevada public record laws about Governor
Brian Sandoval's "cronyism," (2) interventions in several proceedings before state public
utility commissions, and (3) litigation conducted by its lobbying arm in states in which
Sunrun did not operate, like Wisconsin.[5]  CAC ¶ 87.

Finally, the Prospectus warned that the "expiration, elimination or reduction of . . .
rebates and incentives could adversely impact" Sunrun's business.  Prospectus at 18.
Specifically, the Prospectus observed that "changes to net metering policies may
significantly reduce demand for electricity from our solar service offerings," and that utility
companies and other special interests were "currently challenging solar-related policies to
reduce the competitiveness of residential solar energy." Id.  And, as a result, it warned that
the market price of Sunrun stock "may be volatile" and that investors could "lose all of part"
of their investment. Id. at 37–38; see also id. at 8, 15–19, 63, 105–06 (further warnings about
regulatory risk).  Nevertheless, investors bought 17.9 million shares of Sunrun stock for
some $250.6 million during the company's IPO on August 5, 2015.  CAC ¶ 89.

**C.    Midnight**

On October 12, 2015, Hawaii did away with net metering.  CAC ¶ 93.  On December
22, Nevada's Public Utilities Commission allowed utilities to buy back excess solar energy
for less, significantly reducing the incentive that net metering had provided—even for

---

[5] The Prospectus also warned that its information was "not necessarily complete" and directed the reader to examine concurrently filed exhibits, which contained complete copies of relevant documents, among other things. Prospectus at 153; CAC ¶ 88.  It also made clear that Sunrun's website "does not constitute part of" the Prospectus.  Prospectus at 8; CAC ¶ 88.

existing homeowners.[6]  CAC ¶ 94; NV Comm'n Order (dkt. 62-6) ¶ 108.  Two weeks later, Sunrun ceased all Nevada operations.  CAC ¶ 95.  And on January 28, California changed its net metering scheme in a way that "slashed" demand for the company's services.  CAC ¶ 96. Sunrun's stock plummeted, and now trades at less than half its IPO value.  CAC ¶ 99.

Plaintiff Carole Greenberg filed a class action lawsuit against Sunrun, its officers, directors, and underwriters on May 6, 2016 under sections 11, 12(a)(2), and 15 of the Securities Act of 1933.  See Compl. (dkt. 1) at 1–6 (listing parties); 32, 34–35 (causes of action).  Several other related class actions were filed in federal court and consolidated with Greenberg's.[7]  See Order Relating Case (dkt. 23); Minute Order (dkt. 50).  Plaintiffs filed a consolidated class action complaint on October 21, 2016.  See CAC.  The proposed class consists of "all those who purchased Sunrun common stock pursuant or traceable to Sunrun's August 5, 2015 initial public stock offering."  CAC ¶ 1.  They maintain that Sunrun misled investors by (1) telling them in its Prospectus that the company focused on "favorable policy environments," (2) omitting crucial details about Nevada's SB 374, (3) glossing over high growth and increasing concentration in Nevada, (4) boasting about "long term savings" and "predictable pricing," and (5) failing to disclose ongoing legal proceedings as required by law.  CAC ¶¶ 81–88.

---

[6]  The Court takes judicial notice of the commission's order, see Tellabs, 551 U.S. at 322, and notes that a state court has reversed its retroactive application to existing homeowners, see Vote Solar State Court Order (dkt. 62-7) at 12.

[7]  Still more class actions were filed in state court in April 2016 and consolidated before San Mateo Superior Court Judge Marie S. Weiner in October 2016.  There too the proposed class consists of "all those who purchased Sunrun common stock pursuant or traceable to Sunrun's August 5, 2015 initial public stock offering" and seeks remedies under the Securities Act of 1933.  See State Court CAC ¶ 1.  And there too they allege (1), (2), (3), and (4)—though they do not take issue with (5) and focus on the situation in Nevada even more than Plaintiffs do here.  See id. ¶¶ 34–54.  On January 17, 2017, Judge Weiner allowed the case to move forward, reasoning that there were plausible allegations of material misrepresentations or omissions in the Prospectus about "the real possibility of halting operations in Nevada and that Nevada constituted 20% of [Sunrun's] revenue/market."  State Court Order (dkt. 69–2) at 3.
    The parties have not asked the Court to stay these proceedings under the Colorado River doctrine and, in light of the Court's view of the case, it sees no reason to do so.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the Court should dismiss a complaint if it does not plead facts that entitle the plaintiff to relief.  See Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) dismissal "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 562 (2007). The Court must accept all material allegations as true and construe the complaint in the light most favorable to the plaintiff.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996) (citation omitted).

Still, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Papasan v. Allain, 478 U.S. 265, 286 (1986) (citation omitted); see Clegg v. Cult Awareness Network, 18 F.3d 752, 754–55 (9th Cir. 1994).  Rather, it must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). And because this is a securities case, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," lest it fall short of the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA).  15 U.S.C.A. § 78u–4(b)(1).

A complaint should not be dismissed without leave to amend unless there is strong evidence that an amendment will result in "undue delay," "bad faith," "repeated failure to cure deficiencies by amendments previously allowed," or "futility of amendment."  Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty., 708 F.3d 1109, 1117 (9th Cir. 2013) (quotation omitted); see also Fed. R. Civ. P. 15.  The Court should examine whether the

7

1  complaint can be amended to cure the defect "without contradicting any of [the] original

2  complaint." Reddy v. Litton Indus., 912 F.2d 291, 296 (9th Cir. 1990).  Courts should

3  liberally grant leave to amend, but an amended complaint must allege facts consistent with

4  the challenged pleading. Id. at 296–97.

5  **III.   DISCUSSION**

6         For Plaintiffs to state a claim under Section 11 of the Securities Act, they must

7  plausibly allege that the Prospectus "contained an untrue statement of material fact" or

8  "omitted to state a material fact . . . necessary to make the statements therein not

9  misleading."[8]  15 U.S.C. § 77k(a).  So for the former, a statement must be both (1) false and

10  (2) material to investors. See In re Rigel Pharm., Inc. Sec. Lit., 697 F.3d 843, 880 n.8 (9th

11  Cir. 2012).  And for the latter, it is not enough that the Prospectus omitted relevant facts, or

12  even material facts. See In re Rigel, 697 F.3d at 880 n.8 (citing Matrixx Initiatives v.

13  Siracusano, 563 U.S. 27, 38 (2011));  Brody v. Transitional Hospitals Corp., 280 F.3d 997,

14  1006 (9th Cir 2002).  Instead an omission "must affirmatively create an impression of a state

15  of affairs that differs in a material way from the one that actually exists" to be actionable.

16  Brody, 280 F.3d at 1006.

17        The same standard applies for pleading a violation of Section 12(a)(2). See 15 U.S.C.

18  § 77l (imposing liability where a prospectus or communication "includes an untrue statement

19  of a material fact" or "omits to state a material fact necessary in order to make the statements,

20  in the light of the circumstances under which they were made, not misleading").  And to state

21  a claim against a control person under Section 15, Plaintiffs must plausibly allege (1) an

22  underlying violation of Section 11 or 12, and (2) control.[9] See 15 U.S.C. § 77o; In re Rigel

23  Pharm., 697 F.3d at 886.

24  _____

25        [8]  Defendants may also be liable if the Prospectus "omitted to state a material fact required [by
   law] to be stated therein." 15 U.S.C. § 77k(a).

26
27        [9]  Defendants do not dispute control, so the case rises and falls with whether the Prospectus
   contained false or misleading statements within the meaning of Sections 11 and 12(a)(2). See MTD
   (dkt. 60) at 15; Reply (dkt. 68) at 14.

28

United States District Court
For the Northern District of California

1

### A.   "Favorable Policy Environments"

2   Plaintiffs first allege that saying that Sunrun focused on markets with "favorable
3   policy environments" was false at worst and misleading at best because the company's "most
4   important markets" were not in fact favorable.  CAC ¶ 81 (referencing a statement repeated
5   on pages 5 and 96 of the Prospectus).  Plaintiffs mistake a statement about business strategy
6   for an appraisal of market conditions.

7   The full statement reads: "We focus our resources on markets with high electricity
8   rates, favorable policy environments, and other characteristics that allow for low operational
9   costs and favorable unit margins."  Prospectus at 5, 96.  In other words, it informed investors
10  that Sunrun's business model relied on operating in markets with favorable regulations.  That
11  was not false, as the company's exit from Nevada made painfully clear.  See CAC ¶ 95.  And
12  because this quip about favorable policy environments did not suggest that Sunrun's existing
13  markets were guaranteed—or even likely—to keep favorable regulations in place, it imposed
14  no duty to disclose rumblings of regulatory change, material or otherwise.[10]  See Brody, 280
15  F.3d at 1006; In re Stac Electronics Sec. Lit., 89 F.3d 1399, 1406–07 (9th Cir. 1996).

16   Plaintiffs counter that publicly available "truthful information cannot excuse untruths
17  or misleading omissions" in the Prospectus.  See Opp'n (dkt. 66) at 10 (quoting Miller v.
18  Thane Int'l, Inc., 519 F.3d 879, 887 (9th Cir. 2008)).  That argument misses the point.  There
19  was no untruth or misleading omission here.  The Prospectus stressed time and again that
20  regulatory change was a threat to its business, and investors had publicly available
21  information to assess that risk.  That is precisely how securities markets are supposed to
22  work.  See Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 517 (7th Cir. 1989)
23  ("Issuers of securities must reveal firm-specific information.  Investors combine this with
24  public information to derive estimates about the securities' value."); accord Rubke v. Captiol
25  Bancorp Ltd., 551 F.3d 1156, 1162–63 (9th Cir. 2009).

26

27   [10]  This is all the more true of the alleged spat between Sunrun and Nevada Governor Brian
Sandoval.  See CAC ¶ 56.

28

United States District Court
For the Northern District of California

9

United States District Court
For the Northern District of California

1

**B.      Nevada SB 374**

2    Plaintiffs also allege that the Prospectus gave a misleading impression about the

3    content of Nevada's SB 374.  This is probably their least-feeble argument, but it is by no

4    means strong.  For a start, the bill did not require net metering to "be replaced entirely," CAC

5    ¶ 83.  Under SB 374, Nevada utilities "shall" offer net metering.  See SB 374 § 2.3(1)

6    ("[E]ach utility shall, in accordance with a tariff filed by the utility and approved by the

7    Commission, offer net metering to customer-generators . . . ."); SB 374 Legislative Counsel's

8    Digest ("Section 2.3 of this bill requires each electric utility to offer net metering to

9    customers . . . .").  That aside, Plaintiffs also argue that the Prospectus misleadingly

10   sugarcoated SB 374 by referring to the bill as requiring an "uncapped program" to be

11   implemented "no later than December 31, 2015"—which boded well for Sunrun—while

12   failing to mention that it also directed the utilities commission to curb "unreasonable" cost

13   shifting—which did not.[11]  See CAC ¶¶ 82–83; Opp'n at 8.

14   Although this claim might appear to have a glimmer of plausibility, it is a mirage.

15   The very next sentence in the Prospectus warned that if "changes occur to net metering

16   policies without grandfathering to existing homeowners" it could create a "default risk from

17   those homeowners."  Prospectus at 18.  And after highlighting regulatory barriers to entry in

18   non-net metering states, the Prospectus warned that "the imposition of charges that only or

19   disproportionately impact homeowners that utilize net metering would adversely impact our

20   business."  Id.  These caveats could (and probably should) be read to apply to other states in

21   addition to Nevada.  See id.  But they cannot be read to exclude Nevada.  So at worst the

22   Prospectus warned that the devil is in the details without describing precisely where in the

23

24

25

26

_____

27        [11]  It does not matter that the Prospectus "did not even mention" SB 374 by name, Opp'n at 8,
and instead referred to it only as recent "legislation," see Prospectus at 18.

28

10

United States District Court
For the Northern District of California

details the devil might lurk.[12]  That is a far cry from "affirmatively creat[ing] an impression"

that SB 374 was all to the good.  Brody, 280 F.3d at 1006.

### C.    Concentration of Business Operations

Plaintiffs next cry foul because the Prospectus "did not tell investors that Nevada had

become strategically significant to Sunrun, representing its most dynamic growth market, its

second-largest market overall accounting for 20% of Sunrun business, or that it had an even

greater margin impact because it was a low-cost market."  Opp'n at 8; see also CAC ¶¶ 84,

98.[13]  At the risk of further kicks to a dead horse, merely "omitting material information,"

CAC ¶ 84, is not a problem.  See Brody, 280 F.3d at 1006.  Instead, the omitted information

must have been "necessary to make the statements therein not misleading."  15 U.S.C.

§ 77k(a) (emphasis added).  The Court thus starts with what the Prospectus actually said

about the concentration of Sunrun's business:

- "As of March 31, 2015, approximately 58% of our customers were in California and we expect much of our near-term growth to occur in California . . . Accordingly, our business and results of operations are particularly susceptible to adverse . . . conditions in this market and in other markets that may become similarly concentrated."  Prospectus at 23–24.

- "As of March 31, 2015, we offered our solar service offerings to customers in 13 states, with approximately 58% of our customers in California . . . ."  Id. at 52.

- "We currently provide solar energy services in Arizona, California, Delaware, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, Nevada, New Hampshire, New Jersey, New York, Oregon, Pennsylvania and South Carolina, as well as the District of Columbia."  Id. at 104.

As an initial matter, Sunrun's volume in Nevada "grew from almost zero to reach about 20%

of Sunrun-built deployment over only a few quarters," CAC ¶ 98 (quoting March 10, 2016

conference call), but it does not follow that Nevada constituted 20% of Sunrun's deployment

as of March 31, 2015.

---

[12]  As it turned out, the devil lurked in the details about grandfathering to existing homeowners, just as the Prospectus had warned.  See NV Comm'n Final Order (dkt. 62–6) ¶ 108 (charging new and existing customers to the same rates under new regulations).

[13]  Defendants argue that the Court may consider these claims conceded.  See Reply at 13.  They are mistaken.  Plaintiffs raised the issue in opposition, albeit briefly.  See Opp'n at 8.

11

Regardless, the crux of Plaintiff's claim here is that the Prospectus should have expressly listed Nevada alongside California as a state where it was "particularly susceptible" to adverse policy changes, given Sunrun's rapid growth there.  That may have been prudent, but prudence is not the test.  The test is whether a reasonable jury could find that the above statements  "affirmatively" created a misimpression about Sunrun's Nevada operations.  See Brody, 280 F.3d at 1006.  Plaintiffs have not met that bar.  For one thing, the Prospectus noted that "other markets that may become similarly concentrated" could pose risks of their own.  Prospectus at 24.  For another, it informed investors that Nevada could hit its net metering cap "in the next month," and that Nevada was the only market likely to do so within a year.  See id. at 18.  That is a clear indicator of high growth.  So although the Prospectus did not shine the brightest possible spotlight Nevada, it did not hide the ball.

### D.    "Long-term savings" & "Predictable Pricing"

Plaintiffs also try to manufacture a claim about the statement that "Our customers lock-in long term savings."  It doesn't work.  Here is the statement (circled) in context:



1    Plaintiffs might as well go after Olive Garden for promising customers a pasta bowl that

2    never ends.  The securities laws do not exist to combat sales puffery of this sort.  See, e.g.,

3    Philco Investments, Ltd. v. Martin, 2011 WL 500694 at *7 (N.D. Cal. 2011).

4        For the same reason, Sunrun may not be held liable for touting "predictable" pricing

5    for solar energy any more than it could for touting "simple" pricing for solar energy.

6    See CAC ¶ 86 (attacking statement that Sunrun provides "simple, predictable pricing for

7    solar energy" for promising "predictable" pricing but not for promising "simple" pricing).

8    There is likewise no problem with saying that customers are "insulated from rising retail

9    electricity costs."  See Prospectus at 1, 91.  Just as drivers often purchase hybrid cars to be

10   insulated from rising gasoline prices, homeowners often install rooftop solar panels to be

11   insulated from rising utility prices.  Along with environmentalism, that's the core sales pitch.

12       **E.     Pending Litigation**

13       The Prospectus was required by law to describe "any material pending legal

14   proceedings" but not "ordinary routine litigation incidental to the business."  17 C.F.R.

15   § 229.103.  Plaintiffs maintain that (1) public records act litigation in Nevada, (2)

16   interventions in proceedings before state utility commissions, and (3) other litigation

17   conducted by Sunrun's lobbying arm were material legal proceedings.  CAC ¶ 87.  Not so.

18   The public records act litigation in Nevada was not pending until August 25, 2015—three

19   weeks after the IPO.  See Pet. for Writ (dkt. 62–12) ¶ 5.  As for the other two, those were

20   textbook examples of "ordinary routine litigation incidental to the business."  17 C.F.R.

21   § 229.103.  Sunrun operates in a "highly regulated" industry and, as a result, often takes legal

22   action to advance its interests.  Prospectus at 97.[14]  Par for the course.

23

24   ─────────────────

25   [14]   It is no wonder, then, that Plaintiffs appear to have abandoned these claims.
     See generally Opp'n (no mention of failure to disclose material legal proceedings).  Likewise,
     Plaintiffs were right to abandon their claim that the Prospectus improperly "discouraged investors from

26   looking even to Sunrun's own website for additional information" by "stating that the website was 'not
     part of the Prospectus,'" CAC ¶ 88.  SEC regulations required Sunrun to make clear whether its

27   Prospectus had incorporated by reference information on the company's website.  See SEC S–1 General
     Instructions, Item 12.

28

United States District Court
For the Northern District of California

**IV.    CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss.[15]   The Court also concludes that leave to amend would be futile.   The Prospectus, after all, says what is says.   And at the motion hearing on February 3, 2017, Plaintiff's counsel informed the Court that "there are not things we've let out in terms of actionable statements."   That comes as no surprise, since Plaintiffs originally filed seven complaints and then consolidated them over a period of months into the complaint at issue here.   See generally CAC; Order Relating Cases (dkt. 23).   Accordingly, dismissal is WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: February 9, 2017



CHARLES  R. BREYER
UNITED  STATES DISTRICT JUDGE

---

[15]   The Court thus respectfully disagrees with some parts of Judge Weiner's decision in the parallel state court litigation.

14

United States District Court
For the Northern District of California